777 N.W.2d 573 (2010)
279 Neb. 259
Donna BAMFORD and Donna Bamford as Special Administrator of the Estate of James W. Bamford, deceased, appellee and cross-appellant,
v.
BAMFORD, INC., a Nebraska corporation, appellee, and
Jeffrey L. Orr, Trustee, et al., appellants and cross-appellees.
No. S-09-060.
Supreme Court of Nebraska.
January 22, 2010.
*576 Shawn D. Renner, Kevin J. Schneider, Keith T. Peters, and Bren H. Chambers, of Cline, Williams, Wright, Johnson & Oldfather, L.L.P., Lincoln, for appellants.
Michael L. Johnson, of Leininger, Smith, Johnson, Baack, Placzek & Allen, Grand Island, for appellee.
HEAVICAN, C.J., CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
GERRARD, J.

NATURE OF CASE
James W. Bamford founded Bamford, Inc. (Corporation), and served as its president until his death. Before his death, James executed the Bamford Irrevocable Voting Trust (Trust) which transferred all of the voting rights of his Corporation stock to the Trust and specified him as the sole voting trustee until his death. James retained all the other incidents of stock ownership. The Trust named successor trustees that did not include Donna Bamford, James' wife. And the Trust was to continue as long as either James or Donna was alive. In other words, the Trust was meant to permit Donna to inherit the stock, but prevent her from voting it.
After James died, ownership of his stock was transferred to Donna, and Donna filed this action against the Corporation, seeking to void or revoke the Trust. There are two primary issues on appeal: first, whether the Trust is invalid because it could extend for more than 10 years,[1] and second, whether the Trust was effective as a grant of an irrevocable proxy.[2]

FACTS
James founded the Corporation, a heating and air-conditioning contractor, in 1971, and served as president until he died in 2005. Donna is James' surviving spouse and worked for the Corporation from the 1970's until 2004, when she had an argument with another longtime employee, Tom Davolt. Charles Bamford, the son of James and Donna, worked as an independent contractor for the Corporation and has served as a director since July 1996. Charles, at James' request, asked Donna not to return to work after the argument. *577 Shortly after, Donna's employment was terminated.
In August 2004, James told Jeffrey Orr, legal counsel for James and the Corporation, that James was worried about the longevity and continued success of the Corporation. James expressed concern that if Donna obtained control of the Corporation, she would fire key people because she felt she had been mistreated when her job was eliminated. Orr discussed options with James, including "transferring the stock, gifting the stock to the kids," or creating a voting trust. Based on those discussions, Orr prepared the Trust, to which the voting rights for all of James' shares in the Corporation would be transferred. James executed the Trust on October 15, 2004.
The Trust specified that James would remain the sole voting trustee until his death. It designated Davolt and Orr as successor trustees, with Charles and James Votaw, the Corporation accountant, to replace Davolt or Orr, respectively, if they were unable to serve. The Trust provided that Donna receive a salary equal to her 2004 salary plus an annual adjustment based on the Consumer Price Index. At the time the Trust was created, James owned 798 shares of stock in the Corporation and Davolt owned 25 shares. James' shares were evidenced by stock certificate No. 2, on which a note was affixed stating that the "stock certificate is subject to the rights and restrictions granted to the Bamford Irrevocable Voting Trust."
After James' death in June 2005, Orr, as personal representative of James' estate, issued an instrument of distribution of personal property to Donna. The document transferred all of James' shares of the Corporation stock to Donna. The county court for Buffalo County appointed Donna as special administrator of James' estate in order to maintain an action challenging the validity of the Trust.
On June 16, 2006, Donna sent the trustees and the Corporation a notice of invalidity, revocation, or termination of the Trust and demand for reissuance of her shares of the Corporation stock. On October 12, Donna filed this declaratory judgment action on behalf of herself and as the special administrator of James' estate against the Corporation, Orr, Charles, Votaw, and Davolt (collectively the Trustees). Davolt's shares of the Corporation were repurchased by the Corporation on May 11, 2007, and Davolt retired on April 1, 2008. Davolt died on June 9, and this action was revived against his personal representative.
Donna's complaint sought a declaration that, among other things, the Trust was void or, in the alternative, revocable. Both sides filed motions for summary judgment. The district court sustained Donna's motion for summary judgment and denied the Trustees' motion. The court found that because the Trust would not necessarily terminate within 10 years, it was void and of no force or effect. In the alternative, the court determined that to the extent the Trust was a proxy, it was not irrevocable, such that Donna as the shareholder had the right to revoke or terminate the Trust, and had done so. The district court also ordered the Corporation to issue or reissue stock certificates demonstrating that all outstanding shares of the Corporation stock held by James have been transferred to Donna.

ASSIGNMENTS OF ERROR
The Trustees assign that the district court erred in holding that (1) the Trust is void because the trust document does not expressly limit its duration to 10 years *578 and (2) the Trust is not effective as an irrevocable proxy.
On cross-appeal, Donna assigns, restated, that the district court erred in (1) failing to find the trust is illegal and void because it failed to comply with the registration and notice requirements of § 21-2067; (2) finding that James was not the sole beneficiary of the trust and that therefore, it was not invalid under the principle of merger; and (3) failing to hold that a voting trust intended to take effect upon death is void and, to the extent that the trust was a proxy, that it was revoked by James' death.

STANDARD OF REVIEW
Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted, and gives that party the benefit of all reasonable inferences deducible from the evidence.[3]
The meaning of a statute is a question of law.[4] When reviewing a question of law, an appellate court resolves the question independently of the conclusion reached by the trial court.[5]

ANALYSIS
Section 21-2067 provides generally that one or more shareholders of a corporation may create a voting trust, which confers on the trustee the right to vote or otherwise act for them.[6] The voting trust becomes effective when the first shares subject to the trust are registered in the trustee's name.[7] Importantly, as will be discussed later, a voting trust "shall be valid for not more than ten years after its effective date" unless extended by the parties to it.[8]
A voting trust has been described as a device whereby persons owning stock with voting powers divorce the voting rights from the ownership, retaining the ownership to all intents and purposes and transferring the voting rights to trustees in whom the voting rights of all depositors in the trust are pooled.[9] Thus, a voting trust involves the transfer of a shareholder's rights arising from the shares to a trustee, who is authorized to vote the shares in the shareholder's place, while the legal title to the shares remains with the shareholder.[10]
Although statutes regulating voting trusts vary somewhat in their requirements for a valid voting trust, three criteria generally are recognized for a voting trust: (1) The voting rights of the stock are separate from the other attributes of ownership, (2) the voting rights granted are intended to be irrevocable for a definite period of time, and (3) the principal purpose of the grant of voting rights is to *579 acquire voting control of the corporation.[11] In this case, the Trust document itself clearly separates the voting rights of the Bamford stock from the other attributes of ownership, assigning James' voting rights to the Trust while James retained "all other incidents of ownership." The Trust was also expressly irrevocable. And it was clear that the purpose of the Trust was to acquire voting control of the Corporation, at the time of execution and after James' death.
In other words, the Trust was plainly a voting trust subject to the voting trust statute. And because it was, it was subject to the provision that unless extended, a voting trust is valid for no more than 10 years after its effective date. We now turn to the effect of that provision.

TRUST IS VOID BECAUSE IT DOES NOT EXPRESSLY LIMIT ITS DURATION TO 10 YEARS
The Trustees contend, contrary to the district court's conclusion, that § 21-2067(2) limits the duration of a voting trust to 10 years by operation of law, but does not require that the voting trust document itself contain an express limitation of 10 years. There is no dispute that, at least potentially, the terms of the trust would permit it to continue for a period exceeding 10 years. The question, then, is whether the effect of § 21-2067(2) is to terminate the Trust after 10 years, barring an extension, or whether the Trust was invalid from its inception.
In Christopher v. Richardson,[12] the Pennsylvania Supreme Court addressed that question. The issue in Christopher was the validity of a voting trust that had been entered into in connection with dealings between a company and its creditors. The trust had no defined duration, but was to remain "`in full force and effect until all percentage payments ... have been paid in full.'"[13] The Pennsylvania voting trust statute in effect at that time stated that two or more shareholders could "`transfer their shares to any corporation or person for the purpose of vesting in the transferee or transferees all voting or other rights pertaining to such shares for a period not exceeding ten years.'"[14]
The Pennsylvania Supreme Court stated that the statute was a declaration of public policy and explained that in order to be valid, a voting trust agreement must, by its terms, be limited to a period of 10 years or less, or it must be clear from the terms and provisions of the agreement that the voting trust will terminate in 10 years or less.[15] Applying that principle, the court concluded that because the voting trust, by its terms, could remain in effect for a period exceeding 10 years, it was void.[16]
On the other hand, the Trustees rely on Lloyd v. McDiarmid,[17] a 1937 case in which the Ohio Court of Appeals suggested that a statutory 10-year limitation on the irrevocability of voting trusts was read into the voting trust agreement. In that case, a voting trust was to continue until the death of the trustor and the sale of the stock by the successor trustees, which was to occur "if possible" within 5 years of the *580 trustor's death. The Ohio Court of Appeals reasoned that the statutory limitation supplemented the agreement, finding "nothing in the language of the agreement necessarily indicating an intention to go beyond the statute."[18]
We find the Pennsylvania Supreme Court's reasoning more persuasive, and more applicable to this case. It is the function of the Legislature, through the enactment of statutes, to declare what is the law and public policy of this state.[19] And a contract which is clearly contrary to public policy is void.[20] Section 21-2067 provides that a voting trust agreement cannot, absent an extension, extend longer than 10 years. And contrary to the Ohio Court of Appeals' reasoning in Lloyd, the Trust document in this case clearly does indicate an intention to go beyond the statute, as its clear intent is to ensure that Donna never exercise shareholder voting rights, regardless of how long she survives James. To interpret the Trust to self-terminate after 10 years would be to, in effect, reform the Trust in a manner that is inconsistent with its provisions and purpose.
Therefore, we conclude that in order to be valid, a voting trust agreement must, by its terms, be limited to a period of 10 years or less, or it must be clear from the terms and provisions of the agreement that the voting trust will terminate in 10 years or less.[21] Because the Trust, by its terms, may remain in effect for a period exceeding 10 years, it is void as against the public policy expressed in § 21-2067(2).

TRUST IS NOT EFFECTIVE DESPITE VIOLATION OF § 21-2067(2)
In a related argument, the Trustees argue that even if the Trust is not valid as a voting trust, it was still an effective conveyance of James' voting rights. In other words, the Trustees contend that the Trust is an effective conveyance of James' voting rights apart from § 21-2067, because, according to the Trustees, § 21-2067 is not the exclusive means for creating a voting trust. The Trustees suggest that where a trust is created for purposes unrelated to those served by a voting trust statute, the trust can be enforced even though it does not strictly comply with the statute.
In support of their argument, the Trustees cite a Delaware case, Oceanic Exploration Co. v. Grynberg,[22] in which the court upheld a purchase agreement that included an assignment of voting rights, despite the fact that it did not comply with the requirements of the Delaware voting trust statute. The court observed that the voting trust statute was intended to regulate agreements by stockholders, but was not intended to be all inclusive in the sense that it was designed to apply to every set of facts in which voting rights are transferred to trustees. Rather, the court explained that a voting trust is a stockholder-pooling arrangement with the criteria that voting rights are separated out and irrevocably assigned for a definite period of time to voting trustees for control purposes while other attributes of ownership are *581 retained by the depositing stockholders.[23]
In Oceanic Exploration Co., the court held that the test of whether an arrangement is a voting trust which must comply with the statutory requirements to be valid is whether the arrangement is sufficiently close to the purpose of the statute as to warrant being subject to the statute. The court noted many aspects of the agreement that were inconsistent with the purpose of the statute, including that the agreement at issue in that case was an internal corporate reorganization with many aspects besides the assignment of voting rights, which had been substantially performed by the parties, and that the final contract was not among the shareholders but was an agreement between the majority shareholder group and the corporation itself. Therefore, the court concluded that the Delaware statute did not govern the validity of the agreement.[24]
But the reasoning of Oceanic Exploration Co. does not apply in this case, even if we assume, without deciding, that § 21-2067 may not be the exclusive means under Nebraska law for crafting an assignment of voting rights. Here, as discussed above, the Trust fell squarely within the traditional criteria for a voting trust, including the purposes for which the Trust was created. Simply put, if § 21-2067 does not apply to the Trust in this case, it does not apply to anything. Contrary to the Trustees' suggestion, § 21-2067 does not create a "safe harbor"[25] for voting trustsit clearly imposes substantive limitations on the provisions of such agreements. We cannot agree with the Trustees' contention that the voting trust statute does not apply to the facts here. Such an interpretation would lead to an absurd result and render § 21-2067 meaningless. Therefore, we conclude that the Trustees' first assignment of error is without merit.

TRUST IS NOT IRREVOCABLE PROXY
The Trustees next contend that even if the Trust is ineffective as a voting trust, it complies with § 21-2060(4), which allows shareholders to create irrevocable proxies. The Trustees contend that the Trust created a proxy and that the proxy is coupled with one or more interests, so it is irrevocable.
Section 21-2060 provides that shareholders may vote in person or by proxy and establishes the basic rules for appointing a proxy. Section 21-2060(4) provides:
An appointment of a proxy shall be revocable by the shareholder unless the appointment form or electronic transmission conspicuously states that it is irrevocable and the appointment is coupled with an interest. Appointments coupled with an interest shall include the appointment of:
(a) A pledgee;
(b) A person who purchased or agreed to purchase the shares;
(c) A creditor of the corporation who extended it credit under terms requiring the appointment;
(d) An employee of the corporation whose employment contract requires the appointment; or
(e) A party to a voting agreement created under section 21-2068.
And an appointment made irrevocable under § 21-2060(4) is revoked when the interest with which it is coupled is extinguished.[26] *582 We note that § 21-2060 was amended in 2009; the revision does not affect our analysis, and we cite to the current version of the statute for simplicity and convenience.
Here, the first requirementthat the appointment form conspicuously state that it is irrevocableis met. The Trustees contend that the appointment was also coupled with an interest. They concede that any interest Davolt had was extinguished, with either his retirement or his death. And they do not argue that Orr or Votaw has been irrevocably appointed as a proxy. Instead, the Trustees rely on Charles, who they contend has interests in "preserving the [C]orporation from Donna's vengeance and in seeing that [Donna] received income during her lifetime," and as a director of the company and an independent contractor.[27]
There are several potential problems with the Trustees' argument. To begin with, it is not clear that the Trust could operate as a proxy to James, given that he owned the stock for which the "proxy" was purportedly given. A proxy is "[o]ne who is authorized to act as a substitute for another";[28] to describe someone as giving a proxy to himself is somewhat contradictory, and it is questionable whether James' "proxy" could be said to be coupled with an interest when he was the shareholder and had no interest that could be jeopardized by the cancellation of the proxy.[29] We also note that § 21-2060(6) provides that an irrevocable proxy is "revoked," not merely made revocable, when the interest with which it was coupled is extinguishedraising some question as to whether the proxy, even if initially irrevocable, survived James and Davolt. But for purposes of this analysis, we assume that the Trust effectively operates to appoint Charles as a proxy and that the appointment would be irrevocable if coupled with an interest. Our analysis is narrowly limited to whether Charles had an interest within the meaning of the statute.
Although § 21-2060(4) lists several examples of "[a]ppointments coupled with an interest," these examples are not exhaustive and other arrangements may also be held to be "coupled with an interest."[30] In that regard, § 21-2060(4) incorporates the common-law test, based on principles of agency law, for whether an appointment is coupled with an interest.[31] Generally, a power coupled with an interest is a power or authority to do an act, accompanied by or connected with an interest in the subject or thing itself upon which the power is to be exercised, the power and interest being united in the same person.[32] Another common example of a proxy coupled with an interest is to afford the proxyholder security or reimbursement because the agent has parted with something of value, or incurred obligations, for the stockholder.[33]
*583 In other words, for the proxy to be coupled with an interest, the power to vote stock should be beneficial to the proxyholder. Simply being compensated for being the proxyholder is not sufficient.[34] The rationale for the requirement that the interest be in the proxyholder is the need to protect the corporation. The necessary interest of the proxyholder is a proprietary incentive, or comparable security need, to maximize the overall welfare of the corporation so that abuse of the power is rendered highly unlikely.[35]
The specific circumstances included in § 21-2060(4) illustrate that principle. It has also been held, for example, that an appointment was coupled with an interest when two shareholders, whose combined shares were more than a majority of the issued stock, granted one another irrevocable proxies in order that their control of the corporation would survive either's death.[36] It has also been held that the former majority shareholder of a corporation, who received an irrevocable proxy when he sold his stock, had a sufficient interest in remaining chief executive officer of the corporation to support irrevocability.[37] And it has been held that a proxy was coupled with an interest when the proxyholder was a part owner and investor in the corporation.[38]
By contrast, it was held that a proxy was not coupled with an interest when given as security for an underlying obligation that did not actually belong to the proxyholder.[39] We held, in Homan v. Redick,[40] that an agent did not have a power coupled with an interest simply because he received an office, rent free, as part of the compensation for his services. It has also been determined that a proxyholder who had been hired to both vote and sell the stock did not have an interest in the stock, as there was nothing to suggest that his right to reimbursement was jeopardized by the cancellation of his right to vote the stock, as distinguished from his contract as agent to sell it.[41] And it was held that investments and liabilities incurred by a proxyholder's relatives did not rise to the level of being an interest coupled with the appointment of the proxy.[42]
When those holdings are considered collectively, it is clear that Charles' asserted interests in this case do not rise to the level required for a proxy to be irrevocable. The suggestion that Charles has an interest in securing Donna's salary fails for two reasons. First, Donna is a collateral partyher interest is not Charles'.[43] And second, there is nothing to suggest that Donna's interest would be jeopardized by revocation of the proxy, because Donna is *584 the shareholder and presumably capable of voting the shares herself in her own interest.[44] Charles' status as a director and independent contractor, while closer to the mark, also falls short of a direct proprietary interest in the Corporation.[45] And his purported general interest in "preserving the [C]orporation" is plainly insufficient.
In short, we have been unable to find any authorityand the Trustees do not direct us to anysupporting a finding that Charles' purported appointment as a proxy was coupled with a sufficient interest to render it irrevocable. We conclude that § 21-2060(4) does not operate to create an irrevocable proxy under these circumstances, and find no merit to the Trustees' second and final assignment of error.

CROSS-APPEAL
On cross-appeal, Donna makes three basic arguments: (1) The district court erred in holding that the registration and notice requirements of § 21-2067 were substantially complied with and full technical compliance is unnecessary; (2) James was the sole beneficiary of the Trust, and therefore, the Trust is invalid; and (3) the Trust is void because it was intended to take effect upon death. Our resolution of the Trustees' assignments of error is dispositive of this appeal, and therefore, we need not address Donna's assignments of error on cross-appeal.

CONCLUSION
Based on the foregoing reasons, we affirm the district court's order granting Donna's motion for summary judgment and denying the Trustees' motion for summary judgment.
AFFIRMED.
WRIGHT, J., not participating.
NOTES
[1] See Neb.Rev.Stat. § 21-2067(2) (Reissue 2007).
[2] See Neb.Rev.Stat. § 21-2060(4) (Supp. 2009).
[3] Conley v. Brazer, 278 Neb. 508, 772 N.W.2d 545 (2009).
[4] Harvey v. Nebraska Life & Health Ins. Guar. Assn., 277 Neb. 757, 765 N.W.2d 206 (2009).
[5] Curran v. Buser, 271 Neb. 332, 711 N.W.2d 562 (2006).
[6] § 21-2067(1).
[7] § 21-2067(2).
[8] § 21-2067(2) and (3).
[9] Oceanic Exploration Co. v. Grynberg, 428 A.2d 1 (Del.1981).
[10] In re Guardianship of Lombardo, 86 Ohio St.3d 600, 716 N.E.2d 189 (1999).
[11] Jackson v. Jackson, 178 Conn. 42, 420 A.2d 893 (1979).
[12] Christopher v. Richardson, 394 Pa. 425, 147 A.2d 375 (1959).
[13] Id. at 427-28, 147 A.2d at 376 (emphasis omitted).
[14] Id. at 427, 147 A.2d at 376, citing 1933 Pa. Laws 364 (emphasis supplied).
[15] Id.
[16] Id.
[17] Lloyd v. McDiarmid, 60 Ohio App. 7, 19 N.E.2d 292 (1937).
[18] Id. at 12, 19 N.E.2d at 294.
[19] Wilke v. Woodhouse Ford, 278 Neb. 800, 774 N.W.2d 370 (2009).
[20] See Millennium Solutions v. Davis, 258 Neb. 293, 603 N.W.2d 406 (1999).
[21] See § 21-2067(2).
[22] Oceanic Exploration Co., supra note 9.
[23] See id.
[24] See id.
[25] Brief for appellants at 16.
[26] § 21-2060(6).
[27] Brief for appellants at 18-19.
[28] Black's Law Dictionary 1346 (9th ed. 2009).
[29] See State ex rel. Breger v. Rusche, 219 Ind. 559, 39 N.E.2d 433 (1942).
[30] See 2 Model Business Corporation Act Ann. § 7.22, official comment at 7-129 (4th ed. 2008).
[31] See, id.; Zollar v. Smith, 710 S.W.2d 155 (Tex.App.1986).
[32] State ex rel. Everett Etc. v. Pac., Etc., 22 Wash.2d 844, 157 P.2d 707 (1945).
[33] See, Pan American Petroleum Corp. v. Cain, 163 Tex. 323, 355 S.W.2d 506 (1962), overruled on other grounds, Day & Co. v. Texland Petroleum, 786 S.W.2d 667 (Tex. 1990); Deibler v. The Chas. H. Elliott Co., 368 Pa. 267, 81 A.2d 557 (1951); Ecclestone v. Indialantic, Inc., 319 Mich. 248, 29 N.W.2d 679 (1947); State ex rel. Everett Etc., supra note 32; Rusche, supra note 29; Haft v. Haft, 671 A.2d 413 (Del.Ch.1995).
[34] See Pan American Petroleum Corp., supra note 33. See, also, Sjogren v. Clark, 106 Neb. 600, 184 N.W. 159 (1921); Homan v. Redick, 97 Neb. 299, 149 N.W. 782 (1914).
[35] See Zollar, supra note 31.
[36] See State ex rel. Everett Etc., supra note 32.
[37] See Haft, supra note 33.
[38] See Zollar, supra note 31.
[39] See McKelvie v. Hackney, 58 Wash.2d 23, 360 P.2d 746 (1961).
[40] See Homan, supra note 34.
[41] See Rusche, supra note 29.
[42] See Zollar, supra note 31.
[43] See id.
[44] See Rusche, supra note 29.
[45] Compare Zollar, supra note 31.