780 N.W.2d 17 (2010)
279 Neb. 553
RADIOLOGY SERVICES, P.C., appellant,
v.
Katherine Rounsborg HALL, appellee.
No. S-09-171.
Supreme Court of Nebraska.
March 12, 2010.
*19 Michael F. Coyle, David J. Stubstad, and Sherman P. Willis, of Fraser Stryker, P.C., L.L.O., Omaha, for appellant.
William R. Johnson, of Lamson, Dugan & Murray, L.L.P., Omaha, and Raymond E. Walden, of Walden Law Office, for appellee.
HEAVICAN, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.
WRIGHT, J.

I. NATURE OF CASE
The Lincoln County District Court granted summary judgment in favor of *20 Katherine Rounsborg Hall and dismissed the complaint of Radiology Services, P.C. The complaint alleged that Hall, an attorney, committed professional negligence and disseminated trade secrets during and after her legal representation of Radiology Services. We affirm.

II. SCOPE OF REVIEW
In reviewing a summary judgment, the court views the evidence in the light most favorable to the party against whom the judgment was granted and gives such party the benefit of all reasonable inferences deducible from the evidence. Bamford v. Bamford, Inc., 279 Neb. 259, 777 N.W.2d 573 (2010).

III. FACTS
Radiology Services filed a complaint against Hall alleging that she simultaneously represented Radiology Services and her father, Dr. Gerald Rounsborg, regarding his retirement; assisted Rounsborg in competing with Radiology Services after his retirement; disclosed Radiology Services' confidential and proprietary information; and violated Nebraska's Trade Secrets Act, Neb.Rev.Stat. § 87-501 et seq. (Reissue 2008). Hall moved for summary judgment. The district court for Lincoln County found that there were no material facts in dispute and that the facts did not support Radiology Services' alleged causes of action and theories of recovery. It granted Hall's motion for summary judgment and dismissed the case. Radiology Services appeals.
Radiology Services provides radiology services to hospitals, clinics, and other medical facilities in Nebraska and Kansas. Its principal place of business is North Platte, Nebraska. Rounsborg is a radiologist and former employee of Radiology Services. He was employed with the group from 1979 to March 15, 2004, and was president of the group in 2003. His daughter, Hall, is an attorney licensed to practice law in Nebraska. She became the corporate attorney for Radiology Services in 1995.

1. EMPLOYMENT TERMINATION AGREEMENT REVISED
During her representation of Radiology Services, Hall reviewed and revised Radiology Services' employment termination agreement. In 1997, at Radiology Services' request, she drafted the "Employment Termination Agreement Revised" (ETAR). Paragraph 1.4(c) provided:
An EMPLOYEE electing to receive benefits or compensation under this Agreement agrees to refrain for a period of one year following the date of termination from working for or soliciting work from the CORPORATION's then existing hospital clients or accounts with whom the EMPLOYEE actually did business or had personal contact.
The original agreement specified that employees must be employed by the corporation for 10 years before being eligible for deferred compensation pursuant to the agreement. When the ETAR was drafted, Dr. Warren Orr, the founder of the corporation in the late 1970's, was automatically eligible for deferred compensation benefits, and Rounsborg had already been an employee for more than 10 years and would have been eligible under the original agreement. The ETAR provided that he was eligible for benefits as of April 1, 1989. The ETAR also specified that Dr. Kan Wu, who became an employee in 1992, would be eligible as of August 1, 2002. Drs. Tamara Hlavaty, Sam Liu, and David Hatch all became full-time Radiology Services employees in 1998 or later.

2. ALBERT ROBINSON'S EMPLOYMENT AGREEMENT
In March 1998, Hall drafted an employment agreement for Albert Robinson, a *21 radiology technician with Radiology Services. The agreement included a 1-year noncompete clause. Hall sent it to Radiology Services and suggested that Radiology Services contact her with changes so the agreement could be signed by all parties. She followed up with this request on May 28 and on January 22 and April 1, 1999, indicating that she had not heard back regarding the agreement and asking for a signed copy.
In May 1999, at the request of Radiology Services, Hall sent Radiology Services a list of documents that had not been signed or returned to her. Robinson's employment agreement was on this list. Hall advised that she did not have copies of the documents but understood that all of the unreturned documents had been signed. However, Robinson testified that he never saw the employment agreement and never executed it. Robinson resigned on January 16, 2004, and went to work as the director of marketing for Great Plains Radiology, P.C.

3. ROUNSBORG'S RETIREMENT PLANS
Orr retired from Radiology Services on January 31, 2002. Rounsborg gave written notice to Radiology Services in January 2003 that he intended to retire on or about July 1, 2005, and that he was giving advance notice to give Radiology Services adequate time to plan for his departure and recruit a replacement if necessary.
In late 2003, Rounsborg hired Sam Mazzuca to evaluate Radiology Services. As part of the evaluation, Mazzuca talked with the other radiologists in the group and concluded that Rounsborg might have an alcohol problem. Mazzuca met with Hall, one of Rounsborg's sons, and two of Rounsborg's friends. Mazzuca expressed his concerns about Rounsborg's performance, which included memory loss, depression, and an alcohol problem.
Mazzuca asked Hall to participate in a discussion of these problems with Rounsborg. On December 1, 2003, Hall went with Mazzuca to meet Rounsborg to discuss Mazzuca's concerns. Mazzuca told Rounsborg that Radiology Services wanted him to be evaluated and take a 90-day disability leave. After the 90 days, Rounsborg could go back to work if he complied with any recommendations in the evaluation.
Rounsborg did not agree that he had a problem or with the disability status and continued to work his scheduled hours. Because he believed the other radiologists at Radiology Services were determined that he not return to work, Rounsborg agreed to take what he characterized as a leave of absence with pay from December 15, 2003, through March 15, 2004, and to obtain an alcohol assessment. During this time, Radiology Services paid him $38,194.58.
On December 3, 2003, Hall drafted an agreement between Rounsborg and Radiology Services that gave Rounsborg the option to retire on March 15, 2004. The agreement ended with a disclaimer that Hall was Rounsborg's daughter and that Radiology Services had ample opportunity to seek counsel from another source. Neither party executed this agreement. On December 10, 2003, Wu notified Hall that Radiology Services was discontinuing its relationship with her and seeking alternative counsel to avoid the appearance of a conflict of interest.
At a meeting of Radiology Services' board on January 15, 2004, the board removed Rounsborg as an officer of the corporation and elected Wu to serve as president. It also confirmed the discharge of Hall as the corporation's attorney. Rounsborg resolved to leave Radiology Services after the January 15 corporate meeting. *22 The next day, he notified Wu of his intention to retire as of March 15.
Great Plains Radiology subsequently contacted Rounsborg regarding the possibility of his working with them as an independent contractor. Rounsborg advised Great Plains Radiology of his competition restrictions pursuant to the ETAR, including that he agreed to refrain from working for or soliciting work from Radiology Services' clients with whom he had contact. He sent Great Plains Radiology a list of the hospitals that fell under this agreement.
Hall then assisted Rounsborg in setting up a corporation through which he could work as an independent contractor. Despite these arrangements, Rounsborg never worked for Great Plains Radiology or any other radiology group after he retired from Radiology Services.

4. LETTERS TO CLIENTS
On December 17, 2003, Rounsborg sent letters to Radiology Services' clients. The letter stated that Radiology Services had hired a consultant and requested a summary of the client's experience with Radiology Services. Rounsborg requested feedback and complaints, particularly with regard to his work. He asked that responses to the survey be returned to him at his home address. Hall provided Rounsborg with the addresses of the clients.
Following the clients' receipt of the letters, Radiology Services and a hospital in North Platte received several telephone calls from clients with questions concerning the receipt of the letters. Wu believed Radiology Services lost three clients as a result of the letters but admitted he did not have knowledge of anything that linked the loss of the clients to the letters.

5. FINDINGS OF DISTRICT COURT
The district court determined that the evidence was not sufficient to establish that the ETAR unusually or unfairly benefited Rounsborg and that the noncompetition clause in the ETAR did not provide a loophole for Rounsborg to compete. The court also determined that there was no evidence the ETAR was drafted in contradiction to the wishes of Radiology Services. The court found that although Rounsborg established a corporation to continue practicing radiology, there was no evidence that he ever practiced radiology or worked for or solicited a preexisting client of Radiology Services.
Regarding Robinson's employment agreement, the district court found the evidence did not show that Hall ever saw or was in possession of an executed copy of Robinson's agreement. It also found that Hall did not provide Rounsborg with any corporate information he was not entitled to have as a shareholder of the corporation. The court noted it was doubtful that the client list was a trade secret. Determining there was no issue of material fact and that the facts did not support Radiology Services' causes of action and theories of recovery, the court granted Hall's motion for summary judgment and dismissed the complaint.

IV. ASSIGNMENTS OF ERROR
Radiology Services alleges that the district court erred in ruling as a matter of law that Radiology Services asked Hall to draft an "exit agreement" for Rounsborg. It also claims there are issues of fact whether Hall simultaneously represented Radiology Services and Rounsborg, failed to preserve Radiology Services' confidential and proprietary information, and shared Radiology Services' client list, which it characterized as a trade secret. Radiology Services further claims it established *23 proximate causation between Hall's negligence and its damages.

V. ANALYSIS

1. EXIT AGREEMENT
Radiology Services first alleges that the court erred in ruling as a matter of law that Radiology Services asked Hall to draft an exit agreement for Rounsborg. This assignment of error is identical to Radiology Services' first point in its motion to alter or amend the order and judgment filed with the district court. The court issued an order overruling the motion and correcting its initial order with respect to this assignment of error. The latter order states:
Generally the court finds that the arguments and assignments of error submitted by [Radiology Services] are without merit. The court does note, that it did in fact error [sic] in suggesting a legal finding of fact that an agent for [Radiology Services] requested [Hall] to draft an exit agreement for [Rounsborg].
Regardless, no such agreement was ever executed by Rounsborg or Radiology Services. The court concluded that the correction of the finding of fact did not change the appropriateness of summary judgment in Hall's favor and overruled Radiology Services' motion to alter or amend the judgment. Accordingly, this assignment of error was resolved by the district court and is without merit.

2. LEGAL MALPRACTICE
Radiology Services' remaining assignments of error can be summarized to allege that there were issues of material fact whether several of Hall's actions violated the standard of care for practicing attorneys and whether her actions proximately caused damage to Radiology Services. We review the evidence in a light most favorable to Radiology Services and give Radiology Services the benefit of all reasonable inferences deducible from the evidence to determine whether there is a genuine issue of material fact. See Bamford v. Bamford, Inc., 279 Neb. 259, 777 N.W.2d 573 (2010).
In a civil action for legal malpractice, a plaintiff alleging professional negligence on the part of an attorney must prove three elements: (1) the attorney's employment, (2) the attorney's neglect of a reasonable duty, and (3) that such negligence resulted in and was the proximate cause of loss (damages) to the client. Wolski v. Wandel, 275 Neb. 266, 746 N.W.2d 143 (2008).
It is not disputed that Hall was the corporate attorney for Radiology Services beginning in 1995; that on December 10, 2003, Wu advised her Radiology Services was terminating its relationship with her; and that the termination was ratified by the board on January 15, 2004. The remaining questions are whether Hall neglected a reasonable duty and whether such neglect was the proximate cause of damages to Radiology Services.
In a legal malpractice action, the required standard of conduct is that the attorney exercise such skill, diligence, and knowledge as that commonly possessed by attorneys acting in similar circumstances. Boyle v. Welsh, 256 Neb. 118, 589 N.W.2d 118 (1999). Although the general standard of an attorney's conduct is established by law, the question of what an attorney's specific conduct should be in a particular case and whether an attorney's conduct fell below that specific standard is a question of fact. See Wolski v. Wandel, supra.
A proximate cause is a cause that produces a result in a natural and continuous sequence and without which the result would not have occurred. Bellino v. *24 McGrath North, 274 Neb. 130, 738 N.W.2d 434 (2007). To establish proximate cause, the plaintiff must meet three basic requirements: (1) Without the negligent action, the injury would not have occurred, commonly known as the "but for" rule; (2) the injury was a natural and probable result of the negligence; and (3) there was no efficient intervening cause. Wilke v. Woodhouse Ford, 278 Neb. 800, 774 N.W.2d 370 (2009).
Radiology Services identifies a number of Hall's actions that it claims constituted legal malpractice: (a) drafting a retirement agreement on behalf of Rounsborg and Radiology Services that was advantageous to Rounsborg, (b) simultaneously representing Radiology Services and Rounsborg, (c) drafting letters to Radiology Services' clients on behalf of Rounsborg, (d) disclosing Radiology Services' client contact information, and (e) failing to retain Robinson's noncompete agreement.

(a) Drafting ETAR That Was Advantageous to Rounsborg
Radiology Services claims that the ETAR Hall drafted in 1997 was patently advantageous to Rounsborg and unfair to the other Radiology Services shareholders. At the time the ETAR was drafted, Radiology Services had three professional employeesOrr, Rounsborg, and Wu. Rounsborg joined the group in 1979, and at that time, Orr had been with Radiology Services for several years. Wu became an employee in 1992. Under the original employment termination agreement, employees were entitled to deferred compensation benefits upon their retirement after being employed with Radiology Services for 10 years. The ETAR required an employee to be a shareholder for 10 years before he or she became eligible for deferred compensation benefits.
By 1997, Orr and Rounsborg had been employees of Radiology Services for at least 10 years and had vested interests in deferred compensation benefits under the original agreement. The ETAR preserved these interests, specifying that Rounsborg was eligible to receive deferred compensation as of April 1, 1989. Wu had been an employee for 5 years, and the ETAR preserved his interest, as well as specifying he would be eligible for deferred compensation benefits after August 1, 2002.
All of Radiology Services' full-time employees at the time the ETAR was signed retained the benefits they were entitled to under the original agreement. Hlavaty, Liu, and Hatch all began working for Radiology Services full time after the ETAR was enacted. There is nothing in the record to suggest that the ETAR did not reflect the intention of Radiology Services' shareholders at the time the agreement was drafted or that the agreement was advantageous to Rounsborg. This assignment of error is without merit.

(b) Simultaneous Representation of Radiology Services and Rounsborg
Radiology Services claims that Hall was aware of Rounsborg's intention to retire following the 90-day disability period and that she was negligent in failing to inform the corporation of this plan. It claims that had it known that Rounsborg would not return to work following the disability period, it would not have made disability payments. Radiology Services alleges that it incurred a loss because it paid Rounsborg more than $38,000 in disability payments. The record does not support these claims.
The evidence establishes that Mazzuca, on behalf of Radiology Services, asked Hall to use her influence with Rounsborg to try to persuade him to get an alcohol assessment, which she did on December 1, *25 2003. At the meeting, Mazzuca said he felt the board would pay short-term disability to Rounsborg if he took the assessment and followed its recommendations. Rounsborg inquired about whether he could return to work if the assessment was favorable. He stated that if he were allowed to return to work, he would possibly want the option of working part time and without call obligations. Mazzuca consulted with Wu and advised Rounsborg that Radiology Services would consider allowing him to continue practicing under these conditions.
After meeting with Rounsborg and Mazzuca, Hall drafted an agreement intended to be between Radiology Services and Rounsborg indicating that Rounsborg would take vacation from December 15, 2003, until March 15, 2004, and that following the completion of the vacation period, Rounsborg could elect to continue his employment with Radiology Services or retire with no further notice. The agreement disclosed that Hall was Rounsborg's daughter and had performed legal work for Radiology Services in the past. This agreement was never signed by either party.
Rounsborg did not believe that he had any professional competency problems and continued to work his regularly scheduled hours and take previously scheduled vacations until December 15, 2003. At that time, he agreed to take a leave of absence. As it became clear that Radiology Services and Rounsborg would have conflicting positions, on December 10, Wu advised Hall that Radiology Services was terminating its relationship with Hall.
Radiology Services held its annual meeting on January 15, 2004. Rounsborg, Wu, Hlavaty, Liu, Hatch, and Mazzuca were present. Rounsborg was removed as president of the corporation, Wu was elected as the new president, and Rounsborg's access to corporate documents and information was suspended. The board recognized the termination of Hall as its attorney. The board approved Rounsborg's placement on disability status with pay from December 15, 2003, through March 15, 2004. Rounsborg was requested to abide by the noncompete provisions in the ETAR.
The minutes reflect that Rounsborg would be at a health center in Chicago, Illinois, in January 2004 for an assessment and that the future employment of Rounsborg depended on the report from the health center and was at the discretion of the officers. Rounsborg asked if the board would allow him to give less than 90 days' notice if he decided to retire. The minutes stated: "[Rounsborg] said that March 15, 2004 would be the possible date to begin his retirement if he decides to retire." The board voted on waiving the 90 days' notice required by the bylaws, and the motion passed. The day after the meeting, on January 16, 2004, Rounsborg notified Wu and Radiology Services that he intended to retire effective March 16.
There is no evidence that any of the board members were deceived by Rounsborg's ultimate decision to retire at the conclusion of his 90-day period of disability leave. Rounsborg's future employment was dependent on his assessment results and the vote of the corporation's officers. Radiology Services considered the possibility that Rounsborg might not come back to work when it asked him to take disability leave.
There is no evidence that Hall made any representation to Radiology Services regarding Rounsborg's retirement, that she made any arrangement for him to retire without advising the board, or that he had made a decision to retire before the January 15, 2004, board meeting. Accordingly, there is no evidence supporting Radiology Services' claim that Hall was *26 negligent regarding this issue or that any possible negligence was the proximate cause of Radiology Services' alleged loss.
Radiology Services also argues that Hall assisted Rounsborg in competing against Radiology Services. This claim is also unfounded. The evidence is clear that after retiring from Radiology Services, Rounsborg never worked as a radiologist again for Great Plains Radiology or anyone else. There is no evidence that Rounsborg solicited business from Radiology Services' clients or that Radiology Services lost any business due to the actions of Rounsborg or Hall.

(c) Letters to Radiology Services' Clients Regarding Rounsborg's Performance
On December 17, 2003, Rounsborg sent letters to Radiology Services' clients. The letter noted that Radiology Services had hired a consultant and asked for any complaints, requests for review, or disciplinary actions that had been filed concerning Rounsborg's work at the facility, as well as any other feedback the client had regarding Radiology Services. The letter asked that the responses be sent directly to Rounsborg. Radiology Services claims that Hall drafted the letter and that the letters resulted in Radiology Services' losing three clientshospitals in Ord, Gothenburg, and Cambridge, Nebraska.
Rounsborg was president of Radiology Services at the time he sent out the letters. He had hired Mazzuca to review Radiology Services' operations and sought feedback from clients. There is no evidence that Rounsborg was not authorized to solicit this type of information. Furthermore, the evidence does not establish that the letters resulted in the loss of any clients. Clients who changed radiologists indicated their decisions were based on dissatisfaction with Radiology Services, more helpful technical services offered by Great Plains Radiology, or the client's preference to work with Robinson. Therefore, even if Hall should not have drafted the letter, there is no evidence that her actions were the proximate cause of any damages Radiology Services suffered due to the loss of three clients.

(d) Confidential and Proprietary Information and Trade Secret
Radiology Services alleges that Hall committed legal malpractice by disclosing its client contact information to Rounsborg and Great Plains Radiology. It claims this disclosure constituted a failure to preserve confidential and proprietary information. Also relevant to this discussion is Radiology Services' claim that this disclosure was a trade secret violation.
The evidence shows that Rounsborg was with Radiology Services for 25 years and was president of the corporation in 2003. Rounsborg knew the identities of the corporation's clients. In his deposition, Rounsborg recited a list of Radiology Services' clients from memory. Addresses of these clients were easily ascertainable. Even assuming Hall provided Rounsborg with a list of client addresses, she did not provide him with any information that he did not already have or that he was not otherwise entitled to have as president of the corporation. Her actions did not constitute a failure to preserve confidential or proprietary information.
A customer list can be a trade secret in some circumstances. See Home Pride Foods v. Johnson, 262 Neb. 701, 634 N.W.2d 774 (2001). Courts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources. Id. Where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market. Id. *27 Protected lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers. Id.
To the extent that Hall disclosed the client list to Great Plains Radiology, it is evident that the identification of clients was made to advise Great Plains Radiology of the clients Rounsborg could not work with or solicit to avoid being in violation of his noncompete agreement. The list consisted of the names of the hospital clients and the city where each hospital was located.
It was generally known among medical practitioners which radiology groups were providing services to the various hospitals. Hlavaty testified that if this information was not known, an individual could look at hospital board records or call an administrator, technologist, or physician to determine which radiology group serviced a particular hospital. The "List of Prohibited Hospitals and Facilities" given to Great Plains Radiology listed merely the names and locations of a portion of Radiology Services' customers whom Great Plains Radiology could easily have identified on its own.
Furthermore, there is no evidence that Radiology Services suffered any damages as a result of the disclosure of the customer list to Rounsborg or Great Plains Radiology. Although Radiology Services lost three clients following Rounsborg's departure, each departing hospital indicated that it either was unhappy with the services provided by Radiology Services or wished to maintain its relationship with Robinson. This assignment of error is without merit.

(e) Robinson's Noncompete Agreement
Radiology Services alleges Hall was in possession of a noncompete agreement signed by both Radiology Services and Robinson and that she failed to retain the signed copy. As a result, Robinson was able to solicit accounts for his new employer, Great Plains Radiology. Three clients, hospitals in Gothenburg, Ord, and Cambridge, left Radiology Services and began working with Great Plains Radiology, although only one indicated Robinson was a factor in the decision to switch. Radiology Services estimates that it lost $482,906 in business due to the switches. Without a signed copy of the agreement, Radiology Services claimed it was unable to enforce a noncompete clause or recover damages from Robinson. It is undisputed that Robinson left Radiology Services and solicited its clients on behalf of Great Plains Radiology. However, there is no evidence that Robinson signed the agreement or that Hall had a copy of the signed agreement.
In March 1998, Hall sent Radiology Services a draft of an employment agreement, including a noncompete agreement, for Robinson and asked that Radiology Services contact her with changes so the agreement could be signed by all parties. Hall sent several followup requests indicating that she had not heard back from Radiology Services and asking that a signed copy of the agreement be returned to her and a copy placed in the corporation's minute book. The letters are dated May 28, 1998, and January 22 and April 1, 1999. The April 1 letter includes a draft of an employment agreement for Robinson and notes that if Radiology Services would like her to pursue a written employment agreement with Robinson, it should get back to her. Robinson testified that he never saw the agreement and never executed it.
Robinson resigned from Radiology Services on January 16, 2004. On February 17, a Radiology Services employee called Hall asking for Robinson's employment agreement. The employee noted that Hall *28 was unable to locate a signed agreement from Robinson and that Hall stated she did not recall ever having one.
Although Hall may have believed that Robinson signed the agreement, the evidence does not establish that she was ever in possession of or saw a signed copy of the agreement. Robinson testified he had not seen or executed the agreement, and there is no evidence that anyone else ever saw a signed copy of the agreement. The district court did not err in concluding there was no genuine issue of material fact regarding Robinson's noncompete agreement. Because Hall never had a signed copy, there is no proximate cause between her actions and Radiology Services' loss.

VI. CONCLUSION
Viewing the evidence in the light most favorable to Radiology Services, we conclude that there is no genuine issue of material fact and that Hall is entitled to judgment as a matter of law. Accordingly, we affirm the judgment of the district court.
AFFIRMED.