HOME PRIDE FOODS, INC., A NEBRASKA CORPORATION, APPELLEE,
v. CHRISTOPHER S. JOHNSON ET AL., APPELLANTS.

634 N.W.2d 774

Filed October 19, 2001. No. S-00-514.

Michael J. Lehan, of Kelley & Lehan, P.C., for appellants.

Clay M. Rogers and Patrick E. Griffin, of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, for appellee.

HENDRY, C.J., WRIGHT, CONNOLLY, GERRARD, STEPHAN, McCORMACK, and MILLER-LERMAN, JJ.

CONNOLLY, J.

The appellee, Home Pride Foods, Inc. (Home Pride), sued the appellants, Christopher S. Johnson, Jason J. Johnson, and Consumer's Choice Foods, Inc. (Consumer's Choice), for a permanent injunction and damages under Nebraska's Trade Secrets Act, Neb. Rev. Stat. § 87-501 et seq. (Reissue 1999). After a bench trial, the district court determined that the appellants had used a customer list misappropriated from Home Pride. The court determined the list was a trade secret, issued a permanent injunction, and awarded damages.

This appeal presents the questions, Is a customer list a trade secret, and if so, was the list used by the appellants? Because we decide these issues in Home Pride's favor, we inquire whether Home Pride proved damages. We determine that the district court erred in calculating damages by awarding an amount based on a 25-percent net profit when there is no evidence in the record to support that finding. We also conclude that the court erred in awarding damages for future use of the list when a permanent injunction was also entered. We reverse the district court's award of damages and remand the cause for further proceedings.

## BACKGROUND

### FACTS

Home Pride and Consumer's Choice are competing home food service companies. The companies sell and deliver food products and appliances to their customers.

The parties stipulated that the appellants inappropriately came into possession of the customer list owned by Home Pride.

The appellants stipulated that they paid $800 for the list and knew the list was stolen when they purchased it. The parties further stipulated that under a search warrant for the Consumer's Choice premises related to the purchase of stolen goods, police found copies of the list at the Consumer's Choice premises. The list contains information about the customers such as their names, addresses, telephone numbers, amount of food ordered, and number of reorders of food.

Bryce Johnson, no relation to Christopher Johnson and Jason Johnson, is the president of Home Pride. Before starting Home Pride, he and Christopher Johnson and Jason Johnson were employed by Nebraska Prime Meats (Nebraska Prime). In 1996, Bryce Johnson purchased the customer database of Nebraska Prime and its service contracts.

After the list was purchased, an employee of Nebraska Prime loaded the list into Home Pride's computers. Bryce Johnson testified that there were three different passwords on each computer and that the paper files were also protected. Bryce Johnson, his secretary, and his sales manager were the only people who had access to the customer list. In addition, Home Pride's sales representatives were subject to covenants not to compete and not to divulge trade secrets, including customer lists.

The customer list is a valuable asset of a food service company. Bryce Johnson described the list as "priceless" and testified that if a customer list got into the hands of a competitor, the results could result in significant losses.

Testifying about damages, Bryce Johnson stated the average customer at Home Pride reorders food 4½ times and that the national average is four to eight reorders. According to Bryce Johnson, Home Pride's gross margin of profit was 60 percent and between 30 and 50 percent on reorders. He stated the average value of reorders is between $1,200 and $1,500. After discovery proceedings, he compared customer files at Consumer's Choice against Home Pride's customer list and found that many of the names matched up. By cross-referencing the list, he determined the receipts from Consumer's Choice of the names that matched was $33,605. He assumed the average number of reorders from these customers would be four reorders each.

Using a gross profit margin of 60 percent, he calculated that Home Pride had lost approximately $80,000 in profits because of the theft of the customer list.

Kenneth E. McLaughlin, the previous owner of Nebraska Prime, corroborated Bryce Johnson's testimony. He testified that the customer list contained names of both active and inactive customers. McLaughlin explained that a food service business could be harmed if others knew the customers and the prices, because the company could then be undercut. According to McLaughlin, without the customer list, no business can exist.

McLaughlin testified that when he owned Nebraska Prime, it made every attempt to keep its customer list secret. Nebraska Prime kept the list password protected, and the list was never sold to anyone other than Home Pride. He testified that employees were given lists of people to call but that these employees did not have the master list. He also stated that the Nebraska Prime employee who loaded the list did not have the authority to have the list other than to install it in Home Pride's computers.

McLaughlin testified that between 50 percent and 60 percent of customers would reorder food. According to McLaughlin, most customers would stay with the service for 3 years because they had a service agreement or had bought a freezer through Nebraska Prime which entitled them to a discount on food. He stated that this would lead to between five and six reorders because a customer would have to place that many reorders in order to benefit from the discounts during the period that the appliance was financed.

Home Pride also called two expert witnesses whose testimony generally agreed with Bryce Johnson's testimony about Home Pride's gross profits and the value of the list. Both testified that Home Pride lost $80,000 in gross profits.

Shannon Tews, an acquaintance of Christopher Johnson, corroborated that the appellants misappropriated the use of the list. Tews testified that Christopher Johnson told her he had bought disks copied from Nebraska Prime. She also stated that Christopher Johnson told her that he and his fiance, Kimberly Stigge, the sales manager of Consumer's Choice, were going to contact people within 1 to 2 months so as not to raise eyebrows.

The appellants called Michael Schmidt, an employee of Consumer's Choice. Schmidt was previously employed by Nebraska Prime, where he was in charge of operations. He testified that Nebraska Prime had between 300 and 400 active customers and that there were between 2,000 and 3,000 names on the list. He stated that the list at Nebraska Prime was printed and not password protected. According to him, 40 to 50 percent of Nebraska Prime's business was derived from day-care providers, contrary to Bryce Johnson's claim that Home Pride did not solicit day-care centers. He stated that the average reorder rate is one or two and that the net profit on reorders at Consumer's Choice is 10 percent.

On cross-examination, Schmidt admitted that in April 1999, Consumer's Choice had purchased a home food service business owned by him and had retained him as a consultant. As part of that transaction, he receives between 10 and 20 percent of the sales price from people that he hires and trains for Consumer's Choice. He also conceded that the customer list is an asset of the business.

Stigge testified that the customer list had not been installed on the Consumer's Choice computers and was not used by the appellants. According to Stigge, Christopher Johnson and Jason Johnson did not make sales calls for Consumer's Choice.

Stigge testified there were 40 matches, but 15 of those were acquired by Consumer's Choice before the list was stolen in September 1996. She could not find a file for 1 of the remaining 25 matches. She stated that the rest of the matches were acquired through normal marketing, including day-care provider lists.

Stigge, who had previously been employed by Nebraska Prime as a telemarketer, stated that day-care lists were used at Nebraska Prime, along with other marketing lists. According to her, day-care lists generated the most appointments.

## TRIAL COURT'S FINDINGS

After the conclusion of Home Pride's case, the appellants moved for a directed verdict, which was overruled. The court entered a detailed order finding in favor of Home Pride. The court did not specifically state that it found the customer list to be a trade secret. The court did, however, note McLaughlin's

testimony about the value of the customer list. The court also noted the conflicting testimony about whether the list was used and the value placed on the list.

The court then found that Home Pride had established the presence of 40 names from the stolen list on the Consumer's Choice customer database. The court stated that "[a]t this point, it would seem that the business from those 40 names should, in the absence of other evidence, be attributed to the stolen list." The court then found that Home Pride suffered no damage from those customers of Consumer's Choice acquired before the list was stolen. The court separately addressed the remaining names on the list and found that each customer had been acquired through the use of the stolen list with the exception of three names.

Concerning damages, the court noted that the renewal rate from Nebraska Prime's list was "quite low." The court also noted that most of the customers who were acquired by Consumer's Choice had already purchased a freezer. The court found that this limited the loss to Home Pride since most of the profit lost from those customers would be through reorders or purchases of items other than freezers. The court determined that lost revenues were not the proper measure of damages and that gross profit margins were not reflective of actual damages. The court then determined that there were customers who demonstrated that they were active customers and found those customers represented lost profits, valued at the time of theft at $13,000, or $1,000 per contract. The court calculated the $13,000 based on "25% net profit."

In addition, the court found that the customer list had value because it represented future sales opportunities and provided "real leads in this area." The court found the value of those leads to be $10,000 and stated that "[t]o the extent that this value may represent neither an enrichment to Defendants' or a dollar loss to Plaintiff, it shall be considered a royalty under §87-504." The court awarded Home Pride $23,000 and entered a permanent injunction prohibiting the appellants from continuing to misappropriate the customer list.

## ASSIGNMENTS OF ERROR

The appellants assign, rephrased, that the district court erred in (1) finding that the customer list was a trade secret, (2) finding

that the customer list was used by the appellants, (3) allowing Home Pride a double recovery by entering an order that included damages for both actual damages and unjust enrichment, (4) entering an order for damages without competent evidence to support the award, (5) awarding $10,000 as a reasonable royalty, (6) failing to sustain their motion for a directed verdict, (7) failing to issue specific findings of fact and conclusions of law, and (8) failing to grant their motion for a new trial.

## STANDARD OF REVIEW

We first address the appropriate standard of review. Before the enactment of the Uniform Trade Secrets Act in 1988, this court indicated that an action for damages because of the unlawful use of a trade secret was an action at law, subject to a clearly erroneous standard of review. *Henkle & Joyce Hardware Co. v. Maco, Inc.*, 195 Neb. 565, 239 N.W.2d 772 (1976). In a later case, we held that an action for both an injunction and damages for misappropriation of a trade secret was in equity and subject to a de novo standard of review. *Garner Tool & Die v. Laux*, 204 Neb. 717, 285 N.W.2d 219 (1979). See, also, *Selection Research, Inc. v. Murman*, 230 Neb. 786, 433 N.W.2d 526 (1989) (stating that trade secret action seeking injunction and filed before Trade Secrets Act went into effect was action in equity).

We have not addressed what the appropriate standard of review is in an action brought under Nebraska's Trade Secrets Act for money damages. Courts in other jurisdictions that have adopted the Uniform Trade Secrets Act have treated an action for damages under the act as an action at law. See, e.g., *Elm City Cheese Co. v. Federico*, 251 Conn. 59, 752 A.2d 1037 (1999) (citing cases applying clearly erroneous standard of review); *Basic American, Inc. v. Shatila*, 133 Idaho 726, 992 P.2d 175 (1999); *Weins v. Sporleder*, 569 N.W.2d 16 (S.D. 1997). Thus, courts have held that the definition of a trade secret is a matter of law under the act. But, the question of whether information sought to be protected by the act rises to the level of a trade secret is one of fact for the trial court that is subject to a clearly erroneous standard of review. *Id.*; *Bernier v. Merrill Air Engineers*, 770 A.2d 97 (Me. 2001).

■ We hold that the definition of a trade secret is a question of law. When reviewing questions of law, an appellate court has an obligation to resolve the question independently of the conclusion reached by the trial court. *In re Guardianship & Conservatorship of Donley,* ante p. 282, 631 N.W.2d 839 (2001). Whether information sought to be protected rises to the level of a trade secret under the act is a question of fact. In a bench trial of a law action, a trial court's findings have the effect of a jury verdict and will not be set aside on appeal unless clearly erroneous. *O'Connor v. Kaufman,* 260 Neb. 219, 616 N.W.2d 301 (2000); *Blue Creek Farm v. Aurora Co-op Elev. Co.,* 259 Neb. 1032, 614 N.W.2d 310 (2000).

## ANALYSIS

### MOTION TO DISMISS

■ The appellants contend that the district court erred in failing to grant their motion for a directed verdict. The appellants made a motion for a directed verdict at the end of Home Pride's case, which was overruled. We interpret this motion to be the same as a motion to dismiss. After the motion was overruled, the appellants presented evidence and did not renew their motion at the end of their case. A defendant who, after the overruling of a motion for dismissal made at the close of the plaintiff's evidence, adduces evidence on its own behalf waives any error on the motion for dismissal. *Synacek v. Omaha Cold Storage,* 247 Neb. 244, 526 N.W.2d 91 (1995), *overruled in part on other grounds, Billingsley v. BFM Liquor Mgmt.,* 259 Neb. 992, 613 N.W.2d 478 (2000). We determine that the appellants' argument on this issue has been waived.

### DETERMINATION THAT CUSTOMER LIST WAS TRADE SECRET

The appellants argue that the court erred in determining that the customer list was a trade secret. Section 87-502(4), of the Trade Secrets Act, defines a trade secret as

information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable

by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

This court has never addressed the question whether a customer list can be included in the definition of a trade secret. Other jurisdictions hold that a customer list can constitute protected information under the Uniform Trade Secrets Act. See, e.g, *Brown v. Ruallam Enterprises, Inc.*, 73 Ark. App. 296, 44 S.W.3d 740 (2001); *Ed Nowogroski Ins., Inc. v. Rucker*, 137 Wash. 2d 427, 971 P.2d 936 (1999) (en banc); *Fred's Stores of Miss. v. M & H Drugs*, 725 So. 2d 902 (Miss. 1998); *Morlife, Inc. v. Perry*, 56 Cal. App. 4th 1514, 66 Cal. Rptr. 2d 731 (1997). We agree and hold that a customer list can be included in the definition of a trade secret under § 87-502. The question is whether the customer list rises to the level of a trade secret in this case.

The appellants argue that the customer list could be ascertained by proper means through the use of day-care lists and other marketing lists and that therefore, the customer list was not a trade secret. Courts are reluctant to protect customer lists to the extent that they embody information that is readily ascertainable through public sources. *Morlife, Inc. v. Perry, supra.* But where time and effort have been expended to identify particular customers with particular needs or characteristics, courts will prohibit others from using this information to capture a share of the market. See *id.* Such lists are distinguishable from mere identities and locations of customers that anyone could easily identify as possible customers. *Id.*

The record contains evidence that the customer list contained information not available from publicly available lists. For example, Bryce Johnson testified that the list provided information on customers who had previously placed orders with Home Pride or Nebraska Prime, and the amounts of those orders. With such information, a competitor could undercut Home Pride's pricing. Moreover, if the information was readily available, why did the appellants pay $800 for a stolen list? We determine that the court was not clearly wrong in finding that the list could not be ascertained through proper means.

The appellants also argue that the list was not password protected or kept secret. The record, however, contains evidence that the customer list had independent economic value and was kept secret. Finally, the appellants do not deny that the list was misappropriated. There was evidence in the record to support the court's finding of fact that the customer list was a trade secret. Thus, the finding of the court was not clearly erroneous.

### DETERMINATION THAT CUSTOMER LIST WAS USED BY APPELLANTS

The appellants next argue that the court erred in finding that the customer list was used by them. The appellants argue that Home Pride failed to present any evidence that the list was actually used.

The record contains evidence that previous customers of Home Pride or Nebraska Prime were contacted by Consumer's Choice and that some of these people received discounts on their orders. The record also contains evidence that some of these previous customers did not initiate the contact with Consumer's Choice. Finally, Home Pride's evidence refuted the contention by Consumer's Choice that many of the customers' names were obtained from day-care providers. Thus, there was circumstantial evidence that Consumer's Choice used the customer list, and it was reasonable for the court to infer from this evidence that the list had been used. See, generally, *Morlife, Inc. v. Perry, supra.* We determine that the court was not clearly wrong in finding that the customer list was used by Consumer's Choice.

### DAMAGES FOR LOST PROFITS AND UNJUST ENRICHMENT

The appellants first argue that the court awarded damages for both lost profits and unjust enrichment. The appellants argue that such an award allows a double recovery for the same damages.

Section 87-504 provides:

[A] complainant shall be entitled to recover damages for misappropriation. Damages may include both the actual loss caused by misappropriation and the unjust enrichment caused by misappropriation that is not taken into account in computing actual loss. In lieu of damages measured by any other methods, the damages caused by misappropriation

may be measured by imposition of liability for a reasonable royalty for a misappropriator's unauthorized disclosure or use of a trade secret.

Courts are divided on whether a plaintiff may recover damages for both his or her lost profits and damages for unjust enrichment based on the defendant's gain. See Annot., 11 A.L.R. 4th 12 (1982 & Supp. 2001). A majority of courts hold that damages are to be calculated by either the plaintiff's lost profits or the defendant's gain, whichever is greater, but not a combination of the two. See, *id.*; *Saforo & Associates, Inc. v. Porocel*, 337 Ark. 553, 991 S.W.2d 117 (1999). Other courts allow for a combination of lost profits and unjust enrichment damages under certain circumstances that are not present in this case. See Annot., 11 A.L.R. 4th, *supra.*

We do not decide whether a plaintiff may recover both his or her lost profits and the defendant's gained profits because the court awarded damages based only on lost profits. The court did not base an award on the profit gained by the appellants. The court awarded $10,000 representing the value of leads for future sales opportunities gained by Consumer's Choice because of their misappropriation of the list. This figure did not represent the appellants' unjust enrichment and was characterized by the court as a reasonable royalty. Thus, the court did not award a double recovery for both the lost profits of Home Pride and the gain in profits of Consumer's Choice.

## EVIDENCE OF LOST PROFITS

The appellants next argue that Home Pride failed to provide sufficient proof of lost profits. In particular, the appellants argue that Home Pride failed to present evidence to support its claim for lost profits and that the evidence of lost profits was based only on gross profit without taking expenses into consideration.

While damages need not be proved with mathematical certainty, neither can they be established by evidence which is speculative and conjectural. *Sack Bros. v. Tri-Valley Co-op*, 260 Neb. 312, 616 N.W.2d 786 (2000). We have held that a claim for lost profits must be supported by some financial data which permit an estimate of the actual loss to be made with reasonable certitude and exactness. *World Radio Labs. v. Coopers & Lybrand,*

251 Neb. 261, 557 N.W.2d 1 (1996). In *World Radio Labs.*, a witness provided an opinion regarding lost profits, but no reliable financial data was provided to support the claim. We held under those circumstances that it was error for the district court to submit the claim for lost profits to the jury.

Further, courts in other jurisdictions hold that the proper method of calculating damages for lost profits is on the basis of lost net profits and not gross profits. See, *Brown v. Ruallam Enterprises, Inc.*, 73 Ark. App. 296, 44 S.W.3d 740 (2001); *Fred's Stores of Miss. v. M & H Drugs*, 725 So. 2d 902 (Miss. 1998). Thus, where a plaintiff presents evidence of only gross profits and fails to provide evidence of expenses and overhead costs from which net profits can be calculated, the plaintiff has failed to present sufficient evidence of lost profits. See *Fred's Stores of Miss. v. M & H Drugs, supra* (reversing damage award based on gross profits).

The amount of damages to be awarded is a determination solely for the fact finder, and its action in this respect will not be disturbed on appeal if it is supported by the evidence and bears a reasonable relationship to the elements of the damages proved. *Hawkins v. City of Omaha*, 261 Neb. 943, 627 N.W.2d 118 (2001); *Nebraska Nutrients v. Shepherd*, 261 Neb. 723, 626 N.W.2d 472 (2001).

Home Pride presented evidence of only lost gross profits or losses based on Home Pride's gross profit margin. No evidence was provided regarding Home Pride's expenses or overhead costs. There is no evidence in the record to support a damage award for lost profits. The court, however, based its award on an assumption of a 25-percent net profit. Because no evidence was provided that would allow a calculation of net profit to be made, we determine that the court's award of lost profits was clearly erroneous and must be reversed.

Although we determine that there was insufficient evidence for the court's award of damages for Home Pride's lost profits, we note that evidence was presented regarding the net profit of Consumer's Choice. The net profit realized by Consumer's Choice is recoverable as unjust enrichment as a result of the misappropriation. The record contains testimony from Schmidt

that Consumer's Choice earned a 10-percent net profit on reorders of food. Accordingly, we remand for a determination of damages based on the unjust enrichment to Consumer's Choice.

## AWARD OF ROYALTY

The appellants argue that the court's award of $10,000 as a reasonable royalty is not allowed under the Trade Secrets Act. The court awarded an additional $10,000 for the value of future sales generated by the misappropriation of the list. The court also permanently enjoined the appellants from further use of the list.

 Courts in other jurisdictions have held that it is impermissible double recovery for a court to award damages for future use and, at the same time, issue a permanent injunction barring such use. See, *Sonoco Products Co. v. Johnson*, 23 P.3d 1287 (Colo. App. 2001) (citing cases); *Robert L. Cloud & Associates v. Mikesell*, 69 Cal. App. 4th 1141, 82 Cal. Rptr. 2d 143 (1999).

The court's award for the value of future sales is inconsistent with the issuance of a permanent injunction. Home Pride requested, and was given, a permanent injunction. The court's award of $10,000 for future sales was an impermissible double recovery and is reversed.

## REMAINING ASSIGNMENTS OF ERROR

The appellants also assign that the court erred in failing to issue specific findings of fact and conclusions of law and in failing to sustain a motion for a new trial. We have reviewed these assignments of error and determine they are without merit.

## CONCLUSION

We determine that a customer list can be a trade secret under the Trade Secrets Act. We further determine that the court was not clearly wrong in determining that the customer list was a trade secret under the facts of the case and that it was used by the appellants. We determine, however, that the court erred in awarding damages for lost profits when no evidence of Home Pride's net profits was provided. We further determine that the court erred in awarding $10,000 in damages for future use of the customer list when a permanent injunction had also been issued.

We reverse the award of damages. Because there is evidence of the net profit earned by Consumer's Choice, we remand for a recalculation of damages.

AFFIRMED IN PART, AND IN PART REVERSED AND REMANDED FOR FURTHER PROCEEDINGS.