IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

APPLIED UNDERWRITERS V. PUFALL

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

APPLIED UNDERWRITERS, INC., A NEBRASKA CORPORATION, APPELLANT,

V.

REAGAN R. PUFALL, AN INDIVIDUAL, ET AL., APPELLEES.

Filed June 23, 2020.    No. A-18-975.

Appeal from the District Court for Douglas County: W. RUSSELL BOWIE III, Judge. Affirmed.

Jeffrey A. Silver for appellant.

Christopher R. Hedican and Leigh Campbell Joyce, of Baird Holm, L.L.P., for appellees.

RIEDMANN, BISHOP, and ARTERBURN, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Applied Underwriters, Inc. (AUI), is a Nebraska corporation with its principal place of business in Omaha, Nebraska. It provides, among other things, payroll processing and workers' compensation insurance to businesses throughout the country. Several former AUI employees were involved in the formation of a new business venture which became a competitor to AUI. AUI brought an action against the former employees and various business entities, claiming breach of contract and common law duties related to access to and misappropriation of confidential information. AUI also asserted claims of improper solicitation of AUI's employees to work for the new business venture, tortious interference with a business relationship, diversion of corporate opportunities, unfair competition, and civil conspiracy. AUI sought injunctive relief, damages, court costs, and attorney fees.

- 1 -

AUI appeals from the Douglas County District Court's order granting summary judgment in favor of all defendants. We affirm.

## II. BACKGROUND

### 1. AUI's ALLEGATIONS

Reagan Pufall, Naomi Wilson, Christopher LaMantia, Mary Senff, David Holloway, and Bryan Connolly are all former employees of AUI (collectively Former Employees). The Omaha National Group, LLC; Omaha National Underwriters, LLC; and Omaha National Employer Services, LLC (collectively Omaha National), are entities related to the Former Employees' new business venture. Agman Partners (Agman) is a venture capital partnership that provided financing for Omaha National. These individuals and business entities will be referred to collectively as "Defendants."

In August 2016, AUI filed a complaint against the Defendants (not yet including Holloway or Connolly). AUI claimed that each of the Former Employees had worked for AUI for different periods of time in the past and at present were working for Omaha National. Pufall had been the Vice President of Claim Operations for AUI. In 2009, Pufall "voluntarily resigned" from AUI to work for "Berkshire Hathaway Homestate Company" (BHHC); he later became the President and Chief Executive Officer of Omaha National. AUI alleged that Pufall improperly solicited AUI employees to leave AUI and become employees of Omaha National. LaMantia had been a Business Development Manager for AUI. On or about April 5, 2016, he was terminated from AUI as a result of being involved with Pufall while employed at AUI and with respect to forming Omaha National, which turned out to be a competitor of AUI. AUI alleged that LaMantia and Omaha National had conducted discussions prior to April 5 regarding LaMantia leaving AUI to accept employment with Omaha National. AUI claimed that LaMantia received and collected AUI's confidential information, and it remained in his possession and was being used by the Former Employees to operate Omaha National.

According to AUI, the Former Employees had all executed a "Proprietary Information Agreement" (PIA), containing a provision about retaining confidentiality of trade secret information. In addition, Pufall signed a "Severance Agreement" containing a clause prohibiting solicitation of AUI's current employees or clients for any purpose. AUI also alleged that Agman had or would provide financing for Omaha National.

AUI alleged the following claims in its complaint: (1) breach of contract by the Former Employees related to the noncompetition covenants in the PIA, (2) breach of contract by Pufall related to the nonsolicitation of employee covenant under the Severance Agreement, (3) breach of contract by the Former Employees related to the nondisclosure of confidential information pursuant to the PIA, (4) breach of fiduciary and common law duties, (5) misappropriation of AUI's confidential information, (6) tortious interference with AUI's business relationships with its clients, (7) diversion of corporate opportunities, (8) unfair competition, and (9) civil conspiracy. AUI asserted that Omaha National and Agman "aided and abetted" the Former Employees' breaches of the PIA. AUI also claimed that the other Defendants "aided and abetted" Pufall in his alleged breach of the Severance Agreement. AUI sought to enjoin these defendants from several actions, such as using or retaining any of AUI's confidential information, breaching the PIAs,

soliciting AUI employees to leave employment at AUI, or interfering with AUI's contractual and business relationships with current or potential brokers/agents. AUI also asked for compensatory damages, court costs, and attorney fees.

In September 2016, AUI submitted an amended complaint, which added Holloway as a defendant. In December 2017, with the district court's approval, AUI filed a second amended complaint to add Connolly as a defendant. The amended and second amended complaints were substantially the same as the original complaint except for the addition of Holloway and Connolly as defendants along with similar allegations specific to them (in the same form as those specific to other Former Employees) and asserting the same nine claims against those individuals as well.

## 2. MOTIONS AND ORDERS RELATED TO DISCOVERY

In December 2016, AUI filed a motion for an order to compel the Defendants to answer its first set of interrogatories and requests for production because the Defendants had objected to "virtually every" one of those discovery requests. The discovery at issue was attached to AUI's motion. In February 2017, the district court issued an order on AUI's motion to compel, sustaining it in part and overruling it in part as to the interrogatories and wholly overruling it as to all of the requests for production.

In August 2017, AUI filed a notice of intent to serve a subpoena duces tecum upon "Preferred Professional Insurance Company" (PPIC), which the Defendants resisted. In November, AUI filed a motion to compel the Defendants to respond to a second set of requests for production to which the Defendants had objected. On December 22, the district court denied AUI's motion to compel regarding its second set of requests for production. It also found AUI's subpoena duces tecum on PPIC to be "vague, overbroad and potentially burdensome," and concluded it should be denied.

## 3. MOTIONS FOR SUMMARY JUDGMENT AND RELATED HEARINGS

On December 8, 2017, a hearing took place on the Defendants' initial motion for summary judgment, a copy of which is not contained in our record. The Defendants offered numerous exhibits, including depositions of Senff, Holloway, Wilson, LaMantia, and Pufall (in his individual capacity and as a "30(b)(6) witness"); affidavits of Senff, Holloway, Wilson, LaMantia, Pufall, a self-identified principal with Agman, and a representative of a company who claimed the company was retained by Agman to review Omaha National's business plan; Pufall's PIA and Severance Agreement; AUI's answers to Omaha National's first set of interrogatories; AUI's responses to Omaha National's first set of requests for production (with certain PIAs attached); Omaha National's answers and objections to AUI's first set of interrogatories; a document about Omaha National's workers' compensation and payroll services; and employment offer letters from Omaha National to the Former Employees. Those exhibits were admitted into evidence. Upon AUI's request, the matter was continued to allow the district court to rule on AUI's outstanding motions--a motion for leave to file a second amended complaint and a motion concerning AUI's second request for production and intent to serve a subpoena duces tecum.

In January 2018, the Defendants filed an amended motion for summary judgment. In February, another hearing took place on the request for summary judgment. The Defendants

offered and the district court received Connolly's affidavit into evidence. AUI again moved to continue the hearing, arguing that it had not had a chance to take Connolly's deposition and that its motion to continue would be waived if it entered only some of its evidence in opposition to summary judgment. The record reflects that this second motion to continue was granted.

In April 2018, the hearing on the Defendants' motion for summary judgment reconvened. The Defendants offered LaMantia's second affidavit, which was received into evidence, and an affidavit with an attached report about the insurance business (exhibit 33) to which AUI objected. AUI offered an index (exhibit 30), which consisted of subexhibits of what the index said was a "Declaration" of an AUI representative but looked to consist only of documents apparently related to AUI or Omaha National; complete versions of depositions of Pufall and LaMantia that the Defendants had previously offered into evidence in partial form; and a deposition of Connolly. AUI also offered its representative's affidavit (exhibit 31). The Defendants objected to certain parts of AUI's exhibits. In its later issued order, the district court overruled AUI's objection to exhibit 33, sustained the objection to paragraphs 4 and 5 in exhibit 31, and overruled the objection to subexhibit 5 (of exhibit 30); there was no stated ruling to the objections to other parts of exhibit 30 (paragraphs 9 and 11 of subexhibit 1 and attachment 24 to subexhibit 2) but we find this to be a nonissue to the disposition of this appeal. Further, it was not assigned as error. A summary of the admitted evidence follows.

The Former Employees held various roles while at AUI before ending employment with AUI. Pufall's employment with AUI ended in 2009, Wilson's ended in 2010, Senff's ended in 2011, Holloway's ended in 2013, Connolly's ended in 2015, and LaMantia's ended in 2016. Except for LaMantia, the Former Employees worked for other companies after their employment with AUI ended and before their employment commenced with Omaha National. Specifically, Pufall began working for BHHC in 2009; Omaha National asserted in a discovery objection that AUI was not a parent or subsidiary of BHHC. Pufall said the earliest he considered creating an organization that would become an insurance company was sometime during 2013.

The evidence reflected that at different times, Pufall had discussions with some of the other Former Employees about starting a new enterprise he had in mind. Wilson said that while she was working at BHHC (she worked there until July 2016), she and Pufall talked about "what-ifs, wouldn't it be cool if someday we could do this thing [start a new enterprise]." Pufall estimated that in the summer of 2014, he had conversations with LaMantia and expressed the "idea" he was contemplating of forming a company. Pufall recalled that LaMantia "expressed some level of interest in, potentially, being a part of that if it came to fruition." LaMantia asserted he had first learned of "the possibility of a new company being created during a social conversation" with Pufall that year. Pufall said he was terminated from BHHC in 2015, after it learned Pufall had the idea of creating a new company.

An email exchange from April 4, 2016, reflected that Pufall, LaMantia, and Wilson planned to meet with Agman representatives on April 12 regarding Pufall's intended business plan and financial model for the new venture. Pufall claimed that LaMantia's and Wilson's attendance at that meeting was for them to assess their level of interest in the (tentative) enterprise and provide Agman an opportunity to meet them. LaMantia confirmed with Pufall that he would attend the April 12 meeting. Thereafter, on April 5, AUI terminated LaMantia because, as AUI asserted, it

"discovered his involvement with [Pufall's new venture]" that day. LaMantia claimed that before that date, he had never been offered employment by "the initiative that later resulted in the creation of [Omaha National] and had only expressed an interest in learning more about [it] and a willingness to talk with the people potentially involved." LaMantia and Wilson said they attended the April 12 meeting; LaMantia said Pufall was not there.

According to Pufall, Omaha National was not in existence on April 4, 2016. He claimed that The Omaha National Group, LLC, was formed in June and that this entity was the parent company of the other Omaha National entities. In separate letters dated from August, the Former Employees were offered employment with Omaha National. They were to serve in the following roles: Pufall as President and Chief Executive Officer, Wilson as Chief Operating Officer, Senff as Director of Project Management, Holloway as Vice President of Talent Management, Connolly as Vice President of Finance, and LaMantia as Vice President of Marketing and Client Services.

The record reflects that Omaha National planned to provide workers' compensation insurance and payroll services to small and midsize companies through agents and brokers. Omaha National began "actively marketing its product and issuing quotes for coverage" in September 2017 and, as of November, was "only selling in the State of California." Pufall testified that California was going to be the initial focus of Omaha National's operations; AUI had operated in California at the time Pufall and LaMantia worked there. AUI argues that California is still its target market. The record reflects that both AUI and Omaha National sold (or in Omaha National's case, planned to sell) a product that Pufall characterized as "quite common" in the industry, that is, a "pay-as-you-go" payroll plus workers' compensation product which calculates and bills insurance premiums with the same frequency and at the same time that payroll is run. According to Pufall, there were some differences in how Omaha National would offer its product. For instance, Omaha National would not require customers to purchase both workers' compensation insurance and payroll services as a bundle. Also, billing for Omaha National's product would not be bundled; Pufall suggested that billing for AUI's comparative product blended together payroll fees and premiums. AUI's representative claimed its product at issue was targeted to "small to medium sized employers," although Pufall thought it had only been targeted to "small employers." Pufall agreed that the target market for Omaha National's product was small- to medium-sized employers.

A representative of a company, allegedly retained by Agman to review Pufall's business plan and financial projections, claimed to have used his experience and "publicly available sources" to evaluate that information. As to a presentation by Pufall that he attended regarding those topics, the representative asserted that other than the proposed Omaha National companies, Pufall "presented no information" about "specific insurance companies that was not publicly available." The representative alleged that there are "easily" more than 100 companies that offer the same products AUI offers and which Omaha National proposed to offer.

4. Order of Summary Judgment and Dismissal with Prejudice

On September 21, 2018, the district court entered a detailed 25-page order sustaining the Defendants' motion for summary judgment. AUI's second amended complaint was dismissed with prejudice at AUI's cost. The district court thoroughly addressed each of AUI's claims and found

there was no genuine issue as to any material facts and that each claim failed as a matter of law. We will provide details of the district court's order as needed in our analysis below.

AUI appeals.

## III. ASSIGNMENTS OF ERROR

AUI claims, consolidated and restated, that the district court erred by (1) granting the motion for summary judgment and (2) denying certain motions related to AUI's discovery requests.

## IV. STANDARD OF REVIEW

An appellate court will affirm a lower court's grant of summary judgment if the pleadings and admitted evidence show that there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. In reviewing a summary judgment, an appellate court views the evidence in the light most favorable to the party against whom the judgment was granted and gives that party the benefit of all reasonable inferences deducible from the evidence. *Pittman v. Rivera*, 293 Neb. 569, 879 N.W.2d 12 (2016).

Decisions regarding discovery are directed to the discretion of the trial court, and will be upheld in the absence of an abuse of discretion. *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018).

## V. ANALYSIS

### 1. SUMMARY JUDGMENT

Summary judgment is proper if the pleadings and admissible evidence offered at the hearing show there is no genuine issue as to any material facts or as to the ultimate inferences that may be drawn from those facts and that the moving party is entitled to judgment as a matter of law. *Lindner v. Kindig*, 293 Neb. 661, 881 N.W.2d 579 (2016). A party moving for summary judgment makes a prima facie case for summary judgment by producing enough evidence to demonstrate that the movant is entitled to judgment if the evidence were uncontroverted at trial. *Id.* Once the moving party makes a prima facie case, the burden shifts to the party opposing the motion to produce admissible contradictory evidence showing the existence of a material issue of fact that prevents judgment as a matter of law. *Id.*

### (a) Errors Not Argued or Abandoned

We first point out the various claims addressed by the district court that are not before us on appeal. The district court concluded that summary judgment was warranted on AUI's claims of breach of contract against Omaha National and Agman (that they "'aided and abetted'" the Former Employees in breaching their contracts with AUI) because it found that the alleged underlying offense was one of breach of contract, not a tort. See *Salem Grain Co. v. Consolidated Grain & Barge Co.*, 297 Neb. 682, 900 N.W.2d 909 (2017) (claim of aiding and abetting requires presence of underlying tort). AUI does not contest this conclusion on appeal.

Under a claim labeled "Breach of Contract - Non-Competition Covenants," AUI had alleged that the Former Employees breached their PIAs. The district court concluded that summary judgment was proper on that claim, finding that the Former Employees presented a prima facie case that they are not bound to a noncompete clause in their PIAs "as there is no language in the PIA that can be construed as a non-compete clause." AUI contends, as it had to the district court, that its "causes of action are not premised on a non-compete covenant." Brief for appellant at 16. AUI itself abandons that originally asserted claim.

Further, AUI had alleged that Pufall breached the "non-solicitation of employee covenants" under Pufall's Severance Agreement. Pufall executed that agreement in August 2009, and it provided in part: "you will not directly or indirectly whether for you or any third party solicit or contact any of [AUI's] current employees or clients for any purpose." The district court determined the clause was unenforceable as a matter of law given that there were no "dimensions as to the time or space," and the provision was "greater than necessary in scope to protect AUI's interests." The court concluded that the Defendants were entitled to summary judgment on the claim; AUI does not specifically dispute that. In fact, AUI states: "The Defendants and the district court [sic] continue to assert that this case is about a restrictive covenant. It is not." Reply brief for appellant at 2. AUI asserts that the "protection of confidential and proprietary information, breach of fiduciary duty, tortious interference with contract and conspiracy [are] at the heart of AUI's claims." Brief for appellant at 16. AUI has not specifically challenged the district court's determination that the nonsolicitation clause in Pufall's Severance Agreement is unenforceable as a matter of law and AUI has therefore abandoned its original claim that Pufall breached any such clause.

The district court concluded that the Defendants were entitled to summary judgment as a matter of law on AUI's claim of breach of fiduciary and common law duties. In the portion of AUI's brief dedicated to discussing that claim, AUI cites to legal authority and in a conclusory and general fashion argues in whole: "In the case at bar, genuine issues of material fact exist as to each of the four elements as set out *supra* [(referring to elements to prove breach of fiduciary duty)], thus precluding summary judgment." *Id.* at 24 (emphasis in original). There is no argument as to the alleged breach of common law duties, and we will not address it here.

The district court entered summary judgment as a matter of law in the Defendants' favor on AUI's claim of diversion of corporate opportunities and AUI's separate claim that the Defendants engaged in unfair competition. AUI does not specifically dispute summary disposition of either of those claims (other than to state the competition between it and Omaha National is "far from ordinary and is unfair"). *Id.* at 21. We will therefore not address matters related to this claim.

The district court concluded that AUI's claim of tortious interference with its existing and prospective business relationships was barred by summary judgment as a matter of law "as AUI has not identified business relationships with which [the] Defendants have unjustly interfered." Also, the district court found that the Defendants showed that their alleged interference with AUI's business relations was privileged under the standard set forth in *Lamar Co. v. City of Fremont*, 278 Neb. 485, 771 N.W.2d 894 (2009), such that AUI was unable to prove an essential element of its tortious interference claim. On appeal, AUI says LaMantia was an "at-will employee" so this kind of claim could be brought and then offers a general and conclusory statement that "the listed seven

factors [to determine if the interference with a business relationship is improper] is fact intensive and an analysis of each of those seven factors cannot be properly performed in the summary judgment context. Similarly, whether [the] Defendants were privileged to interfere is a fact question." Brief for appellant at 25-26. While AUI offers that statement about what type of analysis is generally involved to address the merits of a tortious interference claim, AUI does not argue how any evidence in this case creates a genuine issue of material fact with respect to either referenced analysis, and we therefore also decline to address this claim.

In order to be considered by an appellate court, an alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error. *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019). Accordingly, we will not address the foregoing claims, which AUI abandons and/or fails to specifically argue on appeal.

(b) Breach of PIA's Nondisclosure Provision and
Misappropriation of Confidential Information

In its brief, AUI combines argument about its related claims of breach of a nondisclosure provision and misappropriation of confidential information. Therefore, we discuss them together. Under its second amended complaint, AUI alleged that the Former Employees breached the PIA's, "particularly the covenants relating to non-disclosure of confidential information." Also, AUI contended that the Defendants "misappropriated, retained and misused valuable and confidential information of AUI for their benefit and the benefit of a competitor."

Although AUI highlights provisions concerning confidential information from Pufall's Severance Agreement, the second amended complaint shows that AUI's claim is confined to language of the PIAs. In evidence, there are PIAs for Pufall (signed 2001), Wilson (signed 2001), Senff (signed 2004), LaMantia (signed 2012), and Holloway (signed 2012), but not Connolly. As relevant, the 2001 and 2004 versions of the PIA are substantially similar to the 2012 PIA. The 2012 PIA defines proprietary and confidential information or "PCI" as follows:

> PCI means any trade secret or confidential information that [AUI] possesses or may possess in the future that has commercial value within the scope of business activities of [AUI] and/or is not generally known to the public or industry. PCI includes but is not limited to, customer lists, financial statements, software code and formulas, technical information, including research, development, procedures, algorithms, data, designs and know-how, customer files, personnel files, marketing plans, computer records, financial and marketing data, process descriptions, research plans, formulas, payroll, financial or business strategies or affairs or any information entrusted to [AUI] by any third party in confidence, and business strategies.

The 2012 PIA states that the employee agrees to the following:

> To hold PCI in the strictest of confidence and not to divulge to others, nor to use to the detriment of [AUI], nor to use in any business competitive with or similar to any business of [AUI], at any time during his/her employment hereunder or thereafter so long as PCI shall retain a degree of confidentiality giving value to its protection from competitors, trade

secret information obtained during the course of his/her employment hereunder without obtaining prior written permission from the President of [AUI].

In its second amended complaint, AUI alleged that it gave the Former Employees "access" to its confidential information for purposes related to carrying out job functions. AUI argued that its "confidential information" was "essential" to the operation of its business and that such information was "not readily available to the general public." It claimed that LaMantia "received and collected confidential information within AUI," including "agents and brokers, a list of clients, prospective agents and brokers, and pricing structure and commission." AUI believed that its "confidential information" remained in LaMantia's possession and was being used by the Former Employees to operate Omaha National. In discovery, when asked for facts AUI was relying on for its claims premised on breach of a PIA, AUI answered that it was a "remarkable coincidence" that "each of the individual defendants was a former employee of [AUI] with access to [AUI's] proprietary information. In addition, in an e-mail discussing financing the new companies, [Pufall] scheduled a presentation by [LaMantia] for the new venture while [LaMantia] was an employee of [AUI]." In a different response, AUI asserted that the Defendants intended to use AUI's "proprietary business model."

The district court entered summary judgment in the Defendants' favor on AUI's breach of nondisclosure provision claim, finding that AUI's claim amounted to conjecture and speculation. The district court analyzed AUI's misappropriation claim with respect to AUI's "proprietary business model," customer list, and broker list. The court concluded that summary judgment disposition of AUI's misappropriation claim was proper as well.

On appeal, AUI limits its claim of allegedly misappropriated information to documents removed from AUI by Pufall at the end of his employment that was later "used in his presentation to Agman" and AUI's broker and client list. Brief for appellant at 21.

### (i) Governing Law

In order to recover in an action for breach of contract, the plaintiff must plead and prove the existence of a promise, its breach, damage, and compliance with any conditions precedent that activate the defendant's duty. *Phipps v. Skyview Farms*, 259 Neb. 492, 610 N.W.2d 723 (2000).

The Trade Secrets Act (Act) is codified at Neb. Rev. Stat. §§ 87-501 to 87-507 (Reissue 2014). Section 87-502(2) provides that misappropriation means:

(a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

(b) Disclosure or use of a trade secret of another without express or implied consent by a person who:

(i) Used improper means to acquire knowledge of the trade secret;

(ii) At the time of the disclosure or use, knew or had reason to know that his or her knowledge of the trade secret was:

(A) Derived from or through a person who had utilized improper means to acquire it;

- 9 -

(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(iii) Before a material change of his or her position, knew or had reason to know that the information was a trade secret and that knowledge of it had been acquired by accident or mistake.

The definition of a trade secret is a question of law. See *Home Pride Foods v. Johnson*, 262 Neb. 701, 634 N.W.2d 774 (2001).

Trade secret shall mean information, including, but not limited to, a drawing, formula, pattern, compilation, program, device, method, technique, code, or process that:

(a) Derives independent economic value, actual or potential, from not being known to, and not being ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(b) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

§ 87-502(4).

Thus, in Nebraska, if an alleged trade secret is ascertainable at all by any means that are not improper, the would-be secret is peremptorily excluded from coverage under the Act. See *First Express Servs. Group v. Easter*, 286 Neb. 912, 840 N.W.2d 465 (2013). Whether information sought to be protected rises to the level of a trade secret under the Act is a question of fact. See *Home Pride Foods v. Johnson, supra*.

### (ii) Pufall's Removal of Documents from AUI

In discovery, AUI requested that Omaha National identify any materials that any of the Former Employees removed from AUI's offices when their employment with AUI ended. Omaha National admitted that "Pufall took a folder of documents as mementos of co-workers and/or significant events, which were reviewed and approved by [AUI's counsel] at that time." On appeal, AUI complains about the "information" Pufall removed and "claim[ed]" was approved by AUI's counsel. Brief for appellant at 21. AUI disagrees such removal was approved because no "written approval" was provided as the Severance Agreement "required." *Id.* AUI asserts, without citation to the record, that "[t]his misappropriated information was used in [Pufall's] presentation to Agman." *Id.* This claim was neither raised to nor passed upon by the district court, so we cannot consider it. See *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019) (issue not properly presented and passed upon by trial court may not be raised on appeal).

### (iii) AUI's Broker and Client Lists

AUI alleged that its current and prospective agents and brokers and its client list were confidential information, that the Former Employees had "access" to AUI's confidential

- 10 -

information, and that such information remained in LaMantia's possession and was being used by Omaha National. AUI argues that it "made efforts under the circumstances" to maintain secrecy of its broker list. Brief for appellant at 23. Its broker and client lists "would be an economic bonus to Omaha National as a start-up company to allow it to become operational instantly without the time, effort, and expense expended by AUI over the years to develop its broader network." *Id.*

During LaMantia's deposition, he said that over the course of his years at AUI, in sales he was responsible for several jurisdictions, including California. While he worked at AUI, LaMantia had access to a database in which a list of brokers doing business with AUI was stored. He used the database to track conversations with brokers and other information. In his affidavit, LaMantia denied taking confidential or proprietary documents with him when he ended employment with AUI. Although he admitted that he could recall some of the names (not specified) of California agents or brokers that did business with AUI, he denied that he had a list of those agents or brokers or that he could access AUI's database from his home computer. The evidence supports that AUI's list of brokers (whatever the contents) was ascertainable by proper means as Pufall stated that Omaha National had purchased a "database of all the insurance agencies in California." Pufall said that as of August 2017, the list had been received and that LaMantia had done work to "whittle it down." LaMantia said he had reviewed the listing that Omaha National had purchased but was not able to know whether any of the agents or brokers on that listing were doing business with AUI just by looking at the list.

Although the Nebraska Supreme Court has held that a customer list can be included in the definition of a trade secret under § 87-502, it has not yet decided whether broker lists can be trade secrets under the same statute. See *Home Pride Foods v. Johnson, supra*. But as the district court reasoned, we need not reach that question. Even if a broker list can be a trade secret and AUI's broker list satisfied § 87-502(4), the Defendants put forth a prima facie case for summary judgment concerning alleged misappropriation of AUI's broker list under § 87-502(2). The evidence showed that LaMantia's access to AUI's broker list ended after he was terminated from AUI and that even though he could recall some names that AUI did business with, Omaha National did not rely on LaMantia's ability to recall AUI's broker list, but independently purchased its own broker list. Therefore, the burden shifted to AUI regarding its claim of misappropriation of its broker list. See *Lindner v. Kindig*, 293 Neb. 661, 881 N.W.2d 579 (2016) (once moving party makes prima facie case, burden shifts to party opposing motion to produce admissible contradictory evidence showing existence of material issue of fact that prevents judgment as matter of law).

AUI points to Connolly's testimony that there were millions of employers and 17,000 brokers in California. AUI argues that Omaha National "in a very short time" was able to "identify three brokers that AUI did business with and three California employers that AUI insured, all of which were with AUI while LaMantia was at AUI." Reply brief for appellant at 6. The evidence included two proposals from Omaha National to different clients and brokers (quote dates 2017 and 2018). Even if those proposals were authentic and were executed at some point, AUI failed to show it ever had a business relationship with those clients and brokers. AUI's unsupported assertions in its briefs about its past relationships with those clients or brokers does not raise a fact issue. As to the third client/broker relationship mentioned in AUI's reply brief, there is no evidence in the record concerning those entities. Although not mentioned in AUI's briefs, we note there is

another proposal purportedly from Omaha National in evidence for a fourth client and broker set (quote date March 2018); in an affidavit, an AUI representative claimed that AUI had a relationship with that broker since 2002, and that AUI insured that client from 2015 to April 2018. But that proposal lacks foundation and authentication as a document that can be properly attributed to Omaha National. AUI did not offer admissible contradictory evidence to meet its burden to show a material issue of fact as to its misappropriation of broker list claim. The Defendants' evidence supporting summary judgment was unrefuted.

As stated previously, customer lists can constitute a trade secret under § 87-502. See *Home Pride Foods v. Johnson, supra*. But even if AUI's client list was a trade secret, there was no evidence that any of the Defendants misappropriated that list (by acquiring or disclosing it). Further, the Defendants' undisputed evidence of how Omaha National operates refutes AUI's claim.

Pufall said Omaha National sells on an "open brokerage basis," meaning that it has no appointed agency relationships but that "any customer is free to purchase [its] products provided they meet the underwriting requirements." In his affidavit, LaMantia echoed that Omaha National operates on an "open brokerage basis." Any broker or agent may contact Omaha National for a quote for the broker's or agent's customer. The customer's broker will seek a quote from many available insurance companies or markets to protect its business relationship with its customer by "blocking the market." If an insurance company receives a submission for an insured through a certain broker, the insurance company cannot then quote that customer through another broker unless notified by the customer that it has terminated its relationship with the prior broker. A broker will contact insurance companies such as AUI and Omaha National to ask for a quote about 90 days before the customer's current policy is set to expire (the "renewal date") "if for no other reason than to ensure their customer does not buy insurance through any other broker." LaMantia said "Omaha National has not initiated a business relationship with the customers it quotes or insures. Rather, brokers have initiated requests for quotes for insurance from Omaha National for their customers." Then Omaha National "provides a quote[,] which the customer ultimately either chooses to accept or rejects."

Any client Omaha National may have serviced was technically the respective broker's customer. There would have been no reason for Omaha National to seek out another insurance company's client list given that Omaha National conducts business through brokers on an open brokerage basis. We have already stated that the Defendants proved a prima facie case against AUI's claim of misappropriation of its broker list and noted that evidence of purported Omaha National proposals or unsubstantiated allegations regarding AUI's past brokers and clients did not create a genuine issue of material fact as to that claim. The burden also shifted to AUI on its claim of misappropriation of its client list; AUI failed to meet its burden. See *Lindner v. Kindig, supra* (explaining burden on party opposing summary judgment). As discussed, AUI's assertions about its past clients were either not fully supported, not admissible evidence, or not offered into evidence at all. As stated by the district court, there was no evidence that Omaha National acquired any of AUI's customers or that any of the Defendants took or compiled a customer list before leaving AUI, accessed AUI's customer list improperly, or sought out clients based on information obtained from AUI.

AUI's claim of misappropriation of its client list and broker list are premised on speculation and conjecture. Conclusions based on guess, speculation, conjecture, or a choice of possibilities do not create material issues of fact for the purposes of summary judgment; the evidence must be sufficient to support an inference in the nonmovant's favor without the fact finder engaging in guesswork. *In re Estate of Fuchs*, 297 Neb. 667, 900 N.W.2d 896 (2017). Therefore, the district court correctly entered summary judgment in the Defendants' favor on AUI's claims regarding misappropriation of its broker and client lists. Further, we agree with the district court that AUI's claim of breach of the PIA nondisclosure provision relating to confidentiality of its broker and client lists, which concerns the same facts relevant to the misappropriations claims already noted, also fails to overcome summary judgment disposition for the same reason that the claim amounts to mere speculation. See *id.*

### (c) Civil Conspiracy

Under its second amended complaint, AUI alleged that the Defendants "agreed, planned and conspired to commit illegal acts," alleging its other claims against the Defendants formed the grounds for the civil conspiracy claim. The district court agreed with the Defendants' argument that summary judgment was warranted on the civil conspiracy claim because AUI could not prove an underlying offense. Moreover, the district court noted that AUI's civil conspiracy claim "does not lie as a matter of law" given that there was no underlying tort. See *Salem Grain Co. v. Consolidated Grain & Barge Co.*, 297 Neb. 682, 900 N.W.2d 909 (2017) (precedent is clear regarding claims of civil conspiracy: conspiracy is not separate and independent tort in itself, but, rather, is dependent upon existence of underlying tort).

Although AUI contests summary judgment disposition of its claim of civil conspiracy, the district court found all underlying offenses were barred by summary judgment. And of those offenses that AUI believed were erroneously dismissed that AUI properly raised on appeal for our review, we found no error with respect to summary judgment entered upon them. Because each claim failed as a matter of law and there remains no alleged underlying tort, the district court correctly entered summary judgment on AUI's civil conspiracy claim. See *Salem Grain Co. v. Consolidated Grain & Barge Co., supra* (without existence of underlying tort, there can be no claim for relief for conspiracy to commit tort).

### 2. MOTIONS RELATED TO DISCOVERY

AUI claims that the district court erred by denying its (1) motion to compel answers or responses to its first set of interrogatories and requests for production, (2) intent to serve a subpoena duces tecum on PPIC, and (3) motion to compel responses to a second set of requests for production.

Under Neb. Ct. R. Disc. § 6-326(b)(1) (rev. 2008), parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action. Although the anticipated inadmissibility of information at trial is not a reason to deny discovery of such information, it is still necessary that discovery appears reasonably calculated to lead to the discovery of admissible evidence. *Moreno v. City of Gering*, 293 Neb. 320, 878 N.W.2d 529 (2016). The party asserting error in a discovery ruling bears the burden of showing that the ruling

was an abuse of discretion. *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018). It is difficult to show that a party has been prejudiced by a discovery order, or that the question is not moot; and the harmless error doctrine, together with the broad discretion the discovery rules vest in the trial court, will bar reversal save under very unusual circumstances. See *Roskop Dairy v. GEA Farm Tech.*, 292 Neb. 148, 871 N.W.2d 776 (2015).

(a) First Set of Interrogatories

AUI disputes the overruling of its motion to compel answers to its first set of interrogatories, specifically Interrogatory Nos. 5, 14, 15, and 16. Interrogatory No. 5 asked for identification of "each entity or individual that Pufall solicited to provide funding for [Omaha National], and the date of each such solicitation." The defense objected that the identity of its "actual and potential funding sources" was not relevant. AUI argues that it "would reveal whether any of AUI's confidential information . . . was provided or how Omaha National would operate." Brief for appellant at 33. At the time it served that discovery, AUI already knew that Agman had or would provide the financing for Omaha National. We note that the record shows that Omaha National received funding from Agman but it refutes that any of AUI's alleged confidential information was shared with Agman; a representative hired by Agman to review Pufall's business plan and financial projections said Pufall's presentation had no information about insurance companies that was not publicly available. As discussed below, AUI had the chance to obtain certain requested documents from an Agman representative it was allowed to depose; none of that information (if any was obtained) was offered into evidence. The extent of communication with any other investment company solicited by Pufall was likely less substantial than that with Agman. AUI does not explain how communication with other investment companies (that led to no formal business relationship) relates to its claims. Further, there is evidence in the record of how Omaha National operates (enough for AUI to create a chart in its brief comparing its organization in several aspects to that of Omaha National). We find no abuse of discretion by the district court with respect to its ruling on Interrogatory No. 5.

As for the remaining interrogatories at issue, Interrogatory No. 14 asked for the name of "any former or current AUI employees that any of the defendants have contacted to become involved with [Omaha National]." Interrogatory No. 15 asked for the "name of each AUI client or former client of AUI for which any defendant has either submitted a proposal or executed a Client Agreement." Interrogatory No. 16 asked for the "date of each such proposal or Client Agreement" concerning "each current or former AUI client." On appeal, AUI summarily argues that Interrogatory Nos. 14, 15, and 16 "went directly to the issue of whether Pufall breached the nonsolicitation provision in his Severance Agreement or the [PIA]." *Id*. Because AUI abandoned its claim of breach of the nonsolicitation provision of the Severance Agreement, any error in barring information sought under Interrogatory No. 14 was harmless. AUI's argument as to Interrogatory Nos. 15 and 16 fails for the same reason; we doubt the relevance of the requested information for that abandoned claim since AUI's second amended complaint suggests that claim concerned the alleged solicitation of its employees, not its clients. Additionally, information sought under Interrogatory Nos. 15 and 16 could not have been relevant to an issue of whether Pufall

breached the nonsolicitation provision of the PIA because there is no nonsolicitation provision in that agreement.

AUI also argues that "Omaha National's solicitation of clients is relevant to establish whether a list of AUI's clients and brokers was misappropriated." *Id.* The Defendants' objection to Interrogatories Nos. 15 and 16 was, in part, that Omaha National did not have any current or proposed clients at that time (December 2016). Pufall later claimed that Omaha National did not even begin "actively marketing its product and issuing quotes for coverage" until September 2017. AUI could not have been prejudiced by the district court barring answers to Interrogatories Nos. 15 and 16, because no clients were receiving coverage from Omaha National at the time of the district court's ruling in February.

### (b) First Request for Production of Documents

AUI disputes the overruling of all of its first request for production of documents. The document requests, which were objected to by the Defendants and are the subject of argument in AUI's brief, sought (1) the "entire file" of each of the Defendants regarding the other Defendants, (2) any presentations related to funding Omaha National, (3) Omaha National's business plans, and (4) all presentations made by Pufall to Agman. AUI argues that emails between Pufall and other Former Employees were relevant as to "what was planned, when it was planned, and whether AUI information would be appropriated." Brief for appellant at 32. Regarding all of the denied requests mentioned in its brief, AUI questions how else it would have discovered if its alleged confidential information had been misappropriated. AUI contends that Agman was the only third party (other than PPIC) from which it could discover information (although AUI's counsel admitted during oral argument that AUI "could have deposed the customers in California").

As stated previously, there is evidence in the record that refutes that any of AUI's alleged confidential information was shared with Agman. We note that the district court later allowed AUI to take a deposition duces tecum of an Agman representative about "matters related specifically to the allegations in the [complaint]." And the court ordered that if Agman had any documents listed on AUI's deposition notice (e.g., documents reflecting Omaha National's business plan or formation or ownership of The Omaha National Group, LLC, or any of Agman's agreements), the parties were to enter into a protective order limiting the use and dissemination of that information. If an Agman representative was deposed, that deposition was not offered into evidence. During oral argument, the Defendants' counsel claimed to have produced in discovery the "business proposal Power Point" that was presented to Agman and argued that it is not in the record because it does not "help" AUI or show "any violation." We conclude that the record supports that AUI was not prejudiced as a result of its denied requests. Moreover, the Defendants objected that the requests for the "entire file" of each Defendant was overly broad, unduly burdensome, and ambiguous; we conclude the same.

### (c) Second Request for Production of Documents

AUI also disputes the overruling of its motion to compel responses to its second request for production of documents. The document requests, which are the subject of AUI's argument on appeal, sought (1) a copy of two different consultant reports as identified in an Agman

representative's deposition and (2) all "correspondence and contracts" between Omaha National or Omaha National Insurance Company and PPIC.

AUI argues that the consultant reports were relevant in that they "could refer [to] or reflect AUI's misappropriated . . . confidential information." *Id*. at 34. The Agman representative's deposition is not in evidence so there is no context for what the consulting reports were other than the Defendants' objections to producing them. The Defendants claimed the reports were authored by insurance industry experts hired by Agman to evaluate whether to invest in Omaha National and regarded an assessment of the strengths and weaknesses of the investment opportunity. Again, the record refutes AUI's claims concerning information Omaha National shared with Agman and shows that although provided an opportunity to obtain testimony and documents from Agman, AUI did not offer any of that into evidence. As far as correspondence and contracts between Omaha National and PPIC, AUI contends, "the information submitted to PPIC to obtain that contract could have contained AUI's improperly used proprietary information." *Id.* at 35. The Defendants' objection, in part, asserted that at that time (October 2017) there was only the potential that it "may" contract with PPIC, described as a "'fronting carrier.'" Given that objection, the district court did not abuse its discretion by not allowing AUI to obtain documents that existed (if any, at that point) between Omaha National and PPIC.

### (d) PPIC Subpoena

AUI believes it should have been able to serve a subpoena duces tecum on PPIC for production and permission of inspection and copying of "all documents and records involving a 'fronting' relationship" with any of the Omaha National entities or Omaha National Insurance Company (a nonparty). One of the Defendants' objections was that it was not relevant to AUI's claims that PPIC and Omaha National were "in discussions to form a contractual business relationship." The Defendants also objected that even if it were relevant, AUI did not attempt to limit its request "by relevant subject matter, time period, or even documents originating from the named Omaha National defendants" and "conceivably [sought] every document in [PPIC's] possession that so much as mention[ed] any of the Omaha National defendants, regardless of subject matter or context." The district court did not allow AUI to do so, finding AUI's intended subpoena was "vague, overbroad and potentially burdensome." We do not find that ruling was an abuse of discretion.

### (e) Discovery Summary

In sum, besides conclusory statements that AUI's discovery requests concerned relevant or needed information, AUI does not explain how it would have made any difference to the summary judgment disposition of this case if any of its denied discovery requests would have been granted. And to the extent AUI submitted argument on appeal against disposition of its claims under the second amended complaint, we determined the district court did not err in entering summary judgment on those claims. AUI fails to demonstrate that the discovery rulings of which it complains were an abuse of discretion. See *Wynne v. Menard, Inc.*, 299 Neb. 710, 910 N.W.2d 96 (2018).

As a matter of completeness, we note two more arguments of AUI that pertain to discovery and are not properly before this court. AUI argues about rulings on motions for a protective order filed by Agman and by Pufall and Omaha National in response to intended discovery of AUI, but AUI did not specifically assign error to those rulings so it is not part of our review of discovery rulings. See *U.S. Pipeline v. Northern Natural Gas Co.*, 303 Neb. 444, 930 N.W.2d 460 (2019) (to be considered by appellate court, alleged error must be specifically assigned in brief of party asserting that error). Also, AUI argues for the first time (as far as our record shows), that the answer to one of its interrogatories was nonresponsive and that the defense was under a duty to seasonably amend its answer. Even if AUI's argument has merit, we cannot consider it since it was not raised to or decided by the trial court. See *id.* (issue not properly presented and passed upon by trial court may not be raised on appeal).

## VI. CONCLUSION

We affirm the September 21, 2018, order of the district court, sustaining the Defendants' motion for summary judgment and dismissing AUI's second amended complaint with prejudice.

AFFIRMED.